No. 25-50181

# In the United States Court of Appeals for the Fifth Circuit

ALBERTO MARTINEZ; EMILIO ZAMORA,

*Plaintiffs-Appellees,*

*v.*

UNIVERSITY OF TEXAS AT AUSTIN; JAY HARTZELL, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

TODD DICKERSON
Assistant Attorney General

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (737) 228-7289
Fax: (512) 320-0667

*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50181

ALBERTO MARTINEZ; EMILIO ZAMORA,
*Plaintiffs-Appellees,*

*v.*

UNIVERSITY OF TEXAS AT AUSTIN; JAY HARTZELL, IN HIS OFFICIAL AND INDIVIDUAL
CAPACITY,
*Defendants-Appellants.*

The undersigned counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

| Defendants-Appellants | Defendants-Appellants' Counsel |
|---|---|
| University of Texas at Austin<br>Jay Hartzell | Office of the Attorney General of Texas<br>Ken Paxton<br>Brent Webster<br>Ralph Molina<br>Austin Kinghorn<br>Kimberly Gdula<br>Todd Dickerson (lead trial and appellate counsel) |

| Plaintiffs-Appellees | Plaintiffs-Appellees' Counsel |
|---|---|
| Alberto Martinez | Robert Notzon (trial counsel) |
| Emilio Zamora | Robert W. Schmidt (trial counsel) |

*/s/ Todd Dickerson*
*Counsel of Record for*
*Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants request oral argument as some of the issues in this case are nuanced. Most notably, whether Plaintiffs adequately pled that Jay Hartzell was "essentially the same" as the University of Texas at Austin for purposes 42 U.S.C. § 1981 is a novel issue that could warrant further discussion.

TABLE OF CONTENTS

Certificate of Interested Persons ........................................................ ii
Statement Regarding Oral Argument................................................. iii
Table of Contents............................................................................... iv
Table of Authorities .......................................................................... vi
Introduction ........................................................................................ 1
Statement of Jurisdiction ................................................................... 1
Issues Presented.................................................................................. 2
Statement of the Case ........................................................................ 4

I.   A Summary of Plaintiffs' Claims ............................................ 4

II.  The Facts Underlying Plaintiffs' Title VII and § 1981 Disparate
     Treatment and Retaliation Claims.......................................... 5

     A.   An Overview of Plaintiffs' Disparate Pay Claims.......... 5

     B.   An Overview of Plaintiffs' Disparate Promotions Claims. ........ 13

     C.   An Overview of Zamora's Endowment-Based Claim. ............... 14

     D.   An Overview of Plaintiffs' Retaliation Claims. ................. 14

III. Plaintiffs' OFCCP Charges, and the OFCCP's Decisions on Those
     Charges ................................................................................. 15

IV.  An Overview of the Trial Court's Decision on Defendants' Motion
     to Dismiss ............................................................................ 16

Standard of Review .......................................................................... 17
Summary of the Argument ............................................................... 17
Argument........................................................................................... 19

I.   Plaintiffs' § 1981 Claims are Barred by Qualified Immunity. ........... 19

     A.   An Overview of the Qualified Immunity Doctrine................... 19

     B.   Qualified Immunity Bars Plaintiffs' § 1981 Claims Against
          Hartzell................................................................................. 21

          1.   Plaintiffs Did Not Plausibly Allege that Hartzell was Personally
               Involved in the Alleged Unlawful Acts. ................................. 21

          2.   There was No Clearly Established Law Showing that Hartzell
               Could be Individually Liable Under § 1981. ......................... 25

               (a)  Fifth Circuit Precedent Leaves it Unclear When a Defendant
                    can be Individually Liable Under § 1981............................ 26

                    (i)  Analysis of the Pre-Foley Case Law.............................. 27

(ii)    Analysis of *Foley v. Univ. of Houston Sys.*............................................. 32

(b)    The Precedent Above does Not Clearly Establish that
Hartzell Could be Individually Liable Under § 1981. ........................... 37

II.    Plaintiffs' § 1981 Claims Fail on Plausibility Grounds. ...................................... 38

A.    Unintentional Discrimination is Not Cognizable Under a
Disparate Treatment Theory. .................................................................... 38

B.    An Overview of the Disparate Treatment Pleading Standard and
the *McDonnell Douglas* Framework......................................................... 40

C.    Plaintiffs do Not Allege Key Details for Their Pay-Based Claims;
the Fifth Circuit has Dismissed Similarly Vague Claims.............................. 41

D.    Plaintiffs' Disparate Endowment and Promotion Claims Fail for
Similar Reasons as Their Disparate Pay Claims. ......................................... 47

III.    The Trial Court Correctly Dismissed Plaintiffs' Title VII Retaliation
Claims, and It Should have also Dismissed Their § 1981 Retaliation
Claims. ................................................................................................................ 50

IV.    Plaintiffs do Not Plead § 1981 Disparate Impact Claims, and such a
Claim is Foreclosed by Prior Fifth Circuit Precedent...................................... 51

V.    Plaintiffs' Title VII Disparate Treatment Claims Fail for Largely the
Same Reasons as Their § 1981 Disparate Treatment Claims. ......................... 52

Conclusion............................................................................................................... 52

Certificate of Service ............................................................................................. 53

Certificate of Compliance...................................................................................... 54

## TABLE OF AUTHORITIES

<u>Cases</u>

*Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL-CIO, Local 198,*
495 F. Supp. 3d 392 (M.D. La. 2020) ............................ 52

*Al–Khazraji v. Saint Francis College,*
784 F.2d 505 (3d Cir.1986) ...................................... 21, 34

*Allen v. Hays,*
65 F.4th 736 (5th Cir. 2023) ..................................... 25

*Anderson v. Valdez,*
845 F.3d 580 (5th Cir. 2016) ..................................... 2

*Angus v. Mayorkas,*
No. 22-50600, 2023 WL 3918986 (5th Cir. June 9, 2023) .......... 42, 43

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................ 17, 39, 46

*Atkins v. Hopkins,*
137 F.4th 286 (5th Cir. 2025) ................................... 20, 38

*Bacchus v. New York City Dep't of Educ.,*
137 F. Supp. 3d 214 (E.D.N.Y. 2015) ........................... 51

*Banks v. Herbrich,*
90 F.4th 407 (5th Cir. 2024) .................................... 22

*Bellows v. Amoco Oil Co.,*
118 F.3d 268 (5th Cir. 1997) .................................... passim

*Body by Cook, Inc. v. State Farm Mut. Auto. Ins.,*
869 F.3d 381 (5th Cir. 2017) .................................... 51

*Brown v. Callahan,*
623 F.3d 249 (5th Cir. 2010) .................................... 19

*Brown v. General Servs. Admin.,*
425 U.S. 820 (1976) ............................................ 30

*Burlington N. & Santa Fe Ry. Co. v. White,*
548 U.S. 53 (2006) ............................................. 31

*Burton v. Arkansas Sec'y of State,*
737 F.3d 1219 (8th Cir. 2013) ................................... 2

*Chhim v. Univ. of Tex. at Austin*,
  836 F.3d 467 (5th Cir. 2016) ........................................................ 40, 41, 42, 43

*Cicalese v. Univ. of Tex. Med. Branch*,
  924 F.3d 762 (5th Cir. 2019) ................................................................ 40, 41

*Collier v. Montgomery*,
  569 F.3d 214 (5th Cir. 2009) ........................................................................ 20

*Collins-Pearcy v. Mediterranean Shipping Co. (USA) Inc.*,
  698 F. Supp. 2d 730 (S.D. Tex. 2010) ........................................................ 52

*Demoret v. Zegarelli*,
  451 F.3d 140 (2d Cir. 2006) .......................................................................... 2

Diaz v. Cantu,
  123 F.4th 736 (5th Cir. 2024) ................................................................ 20, 38

*Doe v. Ferguson*,
  128 F.4th 727 (5th Cir. 2025) ................................................................ 23, 24

*Escobar v. Montee*,
  895 F.3d 387 (5th Cir. 2018) ........................................................................ 2

*Faraca v. Clements*,
  506 F.2d 956 (5th Cir. 1975) ................................................................. passim

*Felton v. Polles*,
  315 F.3d 470 (5th Cir. 2002) ................................................................. passim

*Foley v. Univ. of Houston Sys.*,
  355 F.3d 333 (5th Cir. 2003) ................................................................. passim

*Foley v. Univ. of Houston Sys.*,
  6:99-cv-00047 (S.D. Tex.) .......................................................................... 36

*Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Services*,
  380 F.3d 872 (5th Cir. 2004) ................................................................ 23, 25

*Herster v. Bd. of Supervisors of La. State Univ.*,
  887 F.3d 177 (5th Cir. 2018) ........................................................................ 40

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
  920 F.3d 890 (5th Cir. 2019) ........................................................................ 39

*Int'l Truck & Engine Corp. v. Bray*,
  372 F.3d 717 (5th Cir. 2004) ........................................................................ 35

*Jenkins v. La. Workforce Comm'n*,
  713 F. App'x 242 (5th Cir. 2017) ................................................................ 48

vii

*Jett v. Dallas Indep. Sch. Dist.*,
  491 U.S. 701 (1989) ............................................................................passim

*Jones v. Alfred H. Mayer Co.*,
  392 U.S. 409 (1968) .................................................................................... 28

*Lawrence v. Univ. of Tex. Med. Branch at Galveston*,
  163 F.3d 309 (5th Cir. 1999) ............................................................2, 50, 52

*Lee v. Kansas City S. Ry. Co.*,
  574 F.3d 253 (5th Cir. 2009) ..................................................................... 41

*Lindquist v. City of Pasadena Tex.*,
  669 F.3d 225 (5th Cir. 2012) ..................................................................... 45

*Lugar v. Edmondson Oil Co., Inc.*,
  457 U.S. 922 (1982) .................................................................................... 26

*McNeal v. LeBlanc*,
  90 F.4th 425 (5th Cir. 2024) ....................................................................... 2

*Mesa v. Prejean*,
  543 F.3d 264 (5th Cir. 2008) ..................................................................... 22

*Mitchell v. Forsyth*,
  469 U.S. 92 (1985) ....................................................................................... 2

*Morrow v. Meachum*,
  917 F.3d 870 (5th Cir. 2019) ...............................................................20, 37

*Murphy v. Kellar*,
  950 F.2d 290 (5th Cir. 1992) ..................................................................... 21

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
  40 F.3d 698 (5th Cir. 1994) ....................................................................... 52

*Oden v. Oktibbeha Cnty., Miss.*,
  246 F.3d 458 (5th Cir. 2001) ...............................................................passim

*Okeke v. Administrators of Tulane Educ. Fund*,
  No. 21-30451, 2022 WL 1025991 (5th Cir. Apr. 6, 2022) ......................... 39

*Perniciaro v. Lea*,
  901 F.3d 241 (5th Cir. 2018) ..................................................................... 24

*Perry v. VHS San Antonio Partners, L.L.C.*,
  990 F.3d 918 (5th Cir. 2021) ..................................................................... 26

*Peterson v. City of Fort Worth, Tex.*,
  588 F.3d 838 (5th Cir. 2009) ..................................................................... 25

*Pickett v. Tex. Tech Univ. Health Scis. Ctr.*,
   37 F.4th 1013 (5th Cir. 2022) ................................................................ 49

*Pratt v. City of Houston, Tex.*,
   247 F.3d 601 (5th Cir. 2001) .................................................. 2, 26, 50, 52

*Saketkoo v. Admin'rs of Tulane Educ. Fund*,
   31 F.4th 990 (5th Cir. 2022) .................................................................. 41

*Sims v. City of Madisonville*,
   894 F.3d 632 (5th Cir. 2018) ............................................................ 20, 38

*Southard v. Tex. Bd. of Criminal Justice*,
   114 F.3d 539 (5th Cir. 1997) .................................................................. 23

*Taylor v. United Parcel Serv., Inc.*,
   554 F.3d 510 (5th Cir. 2008) ............................................................ 41, 43

*Thompson v. Steele*,
   709 F.2d 381 (5th Cir. 1983) ......................................................... 21, 47, 50

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) .................................................................. 49

*Udeigwe v. Tex. Tech Univ.*,
   733 F. App'x 788 (5th Cir. 2018) ............................................................ 5

*United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*,
   816 Fed. App'x. 892 (5th Cir. 2020) ....................................................... 46

*Washington v. Davis*,
   426 U.S. 229 (1976) ................................................................................ 52

*Watson v. Fort Worth Bank & Tr.*,
   487 U.S. 977 (1988) ................................................................................ 39

*Weathers v. Houston Methodist Hosp.*,
   116 F.4th 324 (5th Cir. 2024) ................................................................ 26

*Whidbee v. Garzarelli Food Specialties, Inc.*,
   223 F.3d 62 (2d Cir. 2000) ..................................................................... 21

*Whitley v. BP, P.L.C.*,
   838 F.3d 523 (5th Cir. 2016) .................................................................. 17

*Whitley v. Hanna*,
   726 F.3d 631 (5th Cir. 2013) .................................................................. 23

*Zandvakili v. Univ. of Cincinnati*,
   No. 23-3396, 2024 WL 278548 (6th Cir. Jan. 25, 2024) ......................... 46

Statutes

28 U.S.C. § 1331 ................................................................................ 1

42 U.S.C. § 1981 .......................................................................passim

42 U.S.C. § 1983 .......................................................................passim

42 U.S.C. 2000e (Title VII)........................................................passim

Other Authorities

*Tenured and Tenured Track Faculty Workload Policy*, COLLEGE OF LIBERAL ARTS............. 45

## INTRODUCTION

Plaintiffs Alberto Martinez and Emilio Zamora are Hispanic professors at the University of Texas at Austin ("UT Austin"). They sued UT Austin and its former President (Jay Hartzell) for national origin discrimination, race discrimination, and retaliation under Title VII and 42 U.S.C. § 1981. This appeal challenges the district court's decisions that: (1) qualified immunity does not protect Hartzell from Plaintiffs' § 1981 claims; (2) Plaintiffs pleaded plausible § 1981 claims against Hartzell; and (3) Plaintiffs pleaded plausible Title VII disparate treatment claims against UT Austin.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, as Plaintiffs brought claims under (1) Title VII and (2) 42 U.S.C. § 1983, the latter of which pursues an alleged violation of their rights under 42 U.S.C. § 1981.

This appeal concerns certain aspects of the district court's January 13, 2025 order, which granted in part and denied in part Defendants' motion to dismiss Plaintiffs' first amended complaint.[1] Specifically, Defendants appeal the district court's decisions that: (1) qualified immunity does not protect Hartzell from Plaintiffs' § 1981 claims; (2) Plaintiffs pleaded plausible § 1981 claims; and (3) Plaintiffs pleaded plausible Title VII

---

[1] ROA.1488–1536; *see also* ROA.860–1179.

1

disparate treatment claims.

On January 23, 2025, the district court granted Defendants' request for a 30-day extension to their deadline to file an appeal, which extended the deadline to March 14, 2025.[2] Defendants filed a notice of appeal on March 6, 2025.[3]

This Court has jurisdiction to review the denial of Hartzell's qualified immunity.[4] This jurisdiction extends to whether Plaintiffs adequately alleged their § 1981 claims.[5]

The Fifth Circuit also has pendent jurisdiction when "the claims involve precisely the same facts and elements."[6] Here, Plaintiffs' § 1981 and Title VII disparate treatment claims contain the same elements and turn on the same facts.[7] Thus, the Fifth Circuit also has jurisdiction over the district court's decision on Plaintiffs' Title VII disparate treatment claims against UT Austin.[8]

## ISSUES PRESENTED

1. **§ 1981 Claim (Personal Involvement):** Hartzell must be "personally involved" in the alleged unlawful conduct to be individually liable here. Plaintiffs do not allege that Hartzell made the allegedly discriminatory pay, promotion, or endowment decisions. Was it clearly established that Hartzell could be personally liable in this context?

2. **§ 1981 Claim ("Essentially the Same"):** It is unclear in the Fifth Circuit

---

[2] ROA.6–7.

[3] ROA.2015–17.

[4] *See Mitchell v. Forsyth*, 469 U.S. 92 (1985); *McNeal v. LeBlanc*, 90 F.4th 425, 430 (5th Cir. 2024).

[5] *Anderson v. Valdez*, 845 F.3d 580, 588 (5th Cir. 2016); *see also Escobar v. Montee*, 895 F.3d 387, 392 (5th Cir. 2018).

[6] *Escobar*, 895 F.3d at 392–93.

[7] *See Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 n.1 (5th Cir. 2001); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999); *see also* ROA.448–525.

[8] *See, e.g., Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1237–38 (8th Cir. 2013) (asserting pendent jurisdiction when the plaintiff asserted Title VII and Section 1983 disparate treatment claims); *Demoret v. Zegarelli*, 451 F.3d 140, 153-54 (2d Cir. 2006) (same).

whether a state actor can be individually liable under 42 U.S.C. § 1981. While the Court has indicated that a defendant must be "essentially the same" as the employer to be liable under § 1981, it has done so only in dicta. Does qualified immunity protect Hartzell from Plaintiffs' § 1981 claims?

3.   **§ 1981 Claims (Disparate Treatment)**

   a.   **Disparate Pay:** Plaintiffs contend that the alleged pay disparities were the result of unintentional bias. Did they allege plausible disparate pay claims?

   b.   **Disparate Endowment (Zamora Only):** Zamora alleges he received an endowment in 2022; he appears to contend that he should have gotten this honor earlier. But Zamora does not allege what endowment he believes he should have received, who decided which professor should receive that endowment, or that he was more qualified than the recipient of that endowment. Did Zamora allege a plausible disparate endowment claim?

   c.   **Disparate Promotions (Zamora):** To establish disparate promotion, the plaintiff generally must have applied for the position sought. Zamora did not allege that he applied for any promotions, or that he wanted to apply but was otherwise deterred from doing so. Did Zamora allege a plausible disparate promotions claim?

   d.   **Disparate Promotions (Martinez):** Martinez bases his disparate promotion claim on vague and flawed allegations that he was more qualified than the persons who received those promotions. He also claims that the History Department did not follow its procedures for promotions. But his amended complaint clearly shows that this procedural departure impacted minority and non-minority professors alike. Did Martinez allege a plausible disparate promotions claim?

4.   **§ 1981 Claims (Retaliation):** The district court correctly dismissed Plaintiffs' Title VII retaliation claims on causation grounds. Yet the district court, in an apparent oversight, allowed Plaintiffs' identical § 1981 retaliation claims to proceed to discovery. Should Plaintiffs' § 1981 retaliation claims be dismissed?

5.   **§ 1981 Claims (Disparate Impact):** The trial court appeared to recognize § 1981 disparate impact claims for Plaintiffs. But they did not allege § 1981 disparate impact claims. And Fifth Circuit precedent shows that disparate impact is not a viable theory of recovery under § 1981. Should Plaintiffs' § 1981 disparate impact claims be dismissed?

6.   **Title VII Claims (Disparate Treatment):** Plaintiffs' Title VII claims against UT Austin are governed by the same elements as their § 1981 claims against Hartzell. If this Court dismisses Plaintiffs' § 1981 claims against Hartzell on

3

failure-to-plead grounds, should their Title VII claims against UT Austin also be dismissed?

## STATEMENT OF THE CASE

## I.     A Summary of Plaintiffs' Claims

Plaintiffs, two Hispanic professors in UT Austin's History Department, allege they did not receive equitable pay, promotions, and endowments.[9] Defendants summarize Plaintiffs' claims relevant to this appeal below.

**Disparate Treatment (Title VII):** Plaintiffs contend they received inequitable pay and promotions due to race and national origin discrimination.[10] Zamora also cites an adverse act relating to his endowments.[11] Plaintiffs assert these claims only against UT Austin.[12]

**Retaliation (Title VII):** Plaintiffs contend they made protected discrimination complaints.[13] They assert they did not receive the pay, promotions, and endowments they should have in retaliation for this protected conduct.[14] Plaintiffs brought these claims only against UT Austin.[15]

**Disparate Treatment and Retaliation (§ 1981):** Plaintiffs assert disparate

---

[9] *See* ROA.452–89, ¶¶ 20–184. "Endowments typically include specially set aside funds donated to the university" that can be used "to supplement a faculty members' salary." ROA.454, ¶¶ 43–45.
[10] ROA.484–85, ¶¶ 211–18.
[11] ROA.472, ¶¶ 152–54.
[12] ROA.484–85, ¶¶ 211–18.
[13] ROA.485, ¶¶ 221–22.
[14] ROA.466, ¶ 112; ROA.468–73, ¶¶ 124–57; ROA.485–86, ¶¶ 219–25.
[15] ROA.485–86, ¶¶ 219–25.

treatment and retaliation claims under 42 U.S.C. § 1983 to pursue an alleged violation of their rights under 42 U.S.C. § 1981.[16] Specifically, they contend that Hartzell—who was then UT Austin's President—violated their rights under the Fourteenth Amendment and 42 U.S.C. § 1981.[17] Plaintiffs do not assert these claims against UT Austin, nor do they assert a disparate impact claim under § 1981.[18] Their § 1981 disparate treatment and retaliation claims turn on the same allegations as their Title VII disparate treatment and retaliation claims.

## II.    The Facts Underlying Plaintiffs' Title VII and § 1981 Disparate Treatment and Retaliation Claims

### A.    An Overview of Plaintiffs' Disparate Pay Claims

Before detailing the nature of Plaintiffs' disparate pay claims, Defendants provide some background helpful to a proper analysis of these claims.

**UT Austin's General Procedures for Pay and Promotion Decisions:** UT Austin Handbook of Operating Procedures ("HOP") 2-2160 states that "[r]ecommendations for salary advancement [and] promotion in rank . . . shall be made on the basis of an annual evaluation of each faculty" in four main areas: (1) teaching; (2) research; (3) service; and (4) other evidence of merit or recognition.[19] The pertinent Department Chair and UT Austin's Budget Council are responsible for preparing

---

[16] *See Udeigwe v. Tex. Tech Univ.*, 733 F. App'x 788, 793 (5th Cir. 2018) ("§ 1983 is the exclusive remedy for alleged violations of § 1981 by state actors—§ 1981 does not create an independent cause of action.").

[17] *See* ROA.486–88, ¶¶ 226–43.

[18] *See* ROA.486–88, ¶¶ 226–43.

[19] ROA.1165.

recommendations concerning a faculty's salary or promotion.[20]

HOP 2-2160 provides that all such recommendations "shall be forwarded to the president for final evaluation and decision."[21] The policy states that UT Austin's President's decisions on such matters must then be "confirm[ed] by the Chancellor of the University System and the Board of Regents."[22]

**The History Department's Salary Guidelines:** Each Department can adopt additional policies regarding pay and promotion decisions.[23] Plaintiffs' History Department implemented a highly mechanical process for making pay decisions, one that leaves little room for discriminatory bias to creep in. Plaintiffs admit as much in a 2018 report they authored.[24]

UT Austin's College of Liberal Arts annually awards each Department a set amount of money towards "merit raises" for faculty members in that Department.[25] For the History Department, a professor can receive a merit raise in one or more of three areas: (1) publications, (2) service, and (3) equity.[26]

Raises for publications and service are awarded mechanically. For publication raises, a single-authored book merits a $5,000 raise, a brief book warrants a $2,000 raise,

---

[20] ROA.1166.
[21] ROA.1166.
[22] ROA.1166.
[23] ROA.1166.
[24] *See* ROA.457, ¶¶ 57–58; ROA.1135.
[25] *See* ROA.1134.
[26] ROA.1136.

a coedited book triggers a $1,500 raise, and so on.[27] The same holds true for service raises. For instance, performing as a graduate adviser nets a $1,500 raise, receiving a book award generates a $200 raise, and obtaining a major grant prompts a $500 raise.[28] As to equity raises, the History Department's process for making such awards is not spelled out in the amended complaint or its incorporated documents.[29]

Plaintiffs acknowledge that the History Department awards "merit raises mainly on the basis of scholarly publications."[30] Reviewing the History Department's merit raise awards for 2018—the only year this information is available, given the underlying record—confirms this point. That year, the College of Liberal Arts gave the History Department $79,615 for merit raises.[31] Of this amount, $38,250 was awarded for publication raises, $23,865 was allocated for service raises, and $17,500 went towards equity raises.[32]

**UT Austin's Faculty Investment Initiative ("FII"):** One additional source of raises during the relevant period came from UT Austin's Faculty Investment Initiatives ("FII"). These university-wide raises were designed to ensure that *all* UT Austin faculty—not just Hispanic professors—are equitably paid.[33]

---

[27] ROA.1136.
[28] ROA.1136.
[29] *See* ROA.448–524, 1132–50.
[30] ROA.1136.
[31] ROA.1134.
[32] ROA.1134
[33] *See* ROA.462, ¶¶ 84–88; ROA.1133, 1151.

The first pertinent set of FII raises occurred in 2018.[34] For the History Department, half of these awards went to minority faculty members.[35] This includes Martinez, who received $37,500 in raises under this initiative.[36] Plaintiffs omit this fact from their amended complaint, although it is supported by a document (Plaintiffs' 2018 report) that was incorporated by reference into their pleading.[37]

The second set of FII raises came in 2020.[38] During Hartzell's presidency, UT Austin allocated $1.7 million in equity raises under this initiative.[39]

Plaintiffs admit that $306,000 of the $1.7 million (18% of the total funds) went to Hispanic faculty members.[40] For context, 7% of UT Austin's tenured and tenure-track faculty are Hispanic.[41] Thus, Hispanic professors received raises under this initiative that far outstripped their representation in UT Austin's workforce.

Plaintiffs state that, prior to Hartzell's appointment as President, UT Austin's Provost allocated $3 million towards these 2020 FII raises.[42] But they offer no facts showing that Hartzell reduced this amount out of discriminatory animus towards

---

[34] ROA.1151.

[35] ROA.1151.

[36] ROA.1151.

[37] *See, e.g.,* ROA.457, ¶ 59 (referring to the 2018 report); ROA.485, ¶ 93 (relying on the 2018 report as one of Plaintiffs' alleged protected complaints of discrimination). Also, Plaintiffs did not move to strike the 2018 report from consideration in connection with Defendants' motion to dismiss. ROA.1496–97.

[38] ROA.426, ¶¶ 84–88.

[39] ROA.426, ¶¶ 87–88.

[40] ROA.426, ¶ 88.

[41] *See* ROA.910; *see also* ROA.459, ¶ 68 (noting that UT Austin employed 47 fulltime Hispanic professors and 758 White fulltime professors).

[42] ROA.462, ¶ 84.

Hispanics. And these funds were earmarked for *any* faculty members who were paid inequitably, not just Hispanic faculty.[43]

**The "Pay Compression" Issue:** Salary inequities can arise for many reasons aside from discrimination. Plaintiffs admitted this in their 2018 report: "Many factors affect faculty compensation: when faculty were hired, publications, promotions, service, outside job offers, serving as head of departments or centers, varying annual budgets, etc."[44]

Plaintiffs cited "pay compression" as a main cause of salary inequities.[45] "Pay compression" is a phenomenon where, largely due to market forces, "[n]ewer faculty are sometimes hired at salaries that exceed those of longtime senior faculty."[46] Plaintiffs wrote extensively about this problem in their 2018 report and acknowledged that it impacts minorities and non-minorities alike.[47]

**Plaintiffs' Disparate Pay Allegations:** Plaintiffs do not pinpoint which pay decisions they are challenging in this lawsuit.[48] For instance, while Plaintiffs generally complain about their salaries, they do not allege they received anything less than what the History Department's guidelines required for publication and service raises. Nor do they contend that the History Department discriminated against Hispanic faculty when

---

[43] *See* ROA.462, ¶¶ 84, 87–88.
[44] ROA.1132.
[45] ROA.1132.
[46] ROA.1132–33, 1150.
[47] ROA.1132–33, 1150; *see also* ROA.949.
[48] *See* ROA.448–524.

giving out merit-based equity raises.

As to the 2018 FII raises, Plaintiffs admitted in their 2018 report that Martinez received $37,500 in raises under this initiative.[49] Zamora does not allege he should have received a 2018 FII raise. Nor does he allege his situation was more "inequitable" than that of the 14 History Department members who qualified for a 2018 FII raise.[50]

Zamora also does not identify whether he received a raise under the 2020 initiative.[51] Instead, Plaintiffs only contend that Martinez did not receive a 2020 FII raise.[52] They do not allege that Hartzell decided, or was involved in deciding, which individual faculty members would receive a FII 2020 raise.[53]

Moreover, Plaintiffs admitted in their original complaint that, while Martinez did not receive a 2020 FII raise, he still "received a raise from a different fund."[54] Plaintiffs further stated in their original complaint that Martinez received a $1,000 raise on September 1, 2023.[55]

---

[49] ROA.1151.

[50] ROA.1151 (noting that 14 History Department faculty members received a 2018 FII raise).

[51] ROA.448–524.

[52] ROA.466, ¶ 115.

[53] *See* ROA.462, ¶¶ 84–88; *cf.* ROA.1165–67 (noting the UT Austin's President's involvement with salary recommendations that are "made on the basis of an annual evaluation of each faculty member," which would not necessarily include a FII raise).

[54] *Compare* ROA.18, ¶ 55 ("In July 2020, Martinez learned, but not from UT officials, that he was denied an Equity Raise from the $3 million fund that Provost McInnis had allocated. *Although Martinez had received a raise from a different fund*, his pay was still below the mean and below other full Professors in the History Department based on publications and other objective criteria.") (emphasis added), *with* ROA.466, ¶ 115 ("[E]ven though UT claimed to be conducting a review and making salary adjustments and raises from a $3 million 'Equity Fund' as stated by Provost McInnis, UT did not provide Martinez with an 'Equity' raise from that fund.").

[55] ROA.18, ¶ 58.

As to which UT Austin employees were involved in the "disparate pay" issue, Plaintiffs admit that their "salaries . . . [are] set by Department Chairs and Deans."[56] There are no allegations that a Dean and Department Chair made any recommendations concerning Plaintiffs' pay that went up to Hartzell for review.[57]

Three final points. First, Plaintiffs acknowledged in their 2018 report that History Department professors have significant control over their salaries: "To some extent salaries *are within each person's control* inasmuch as gaining raises is a matter of 'playing the game.' (E.g., publishing, getting salary supplements from other units at UT, getting outside job offers, advocating for oneself, getting certain admin jobs, etc.)."[58]

Second, in or around August 2020, Plaintiffs "notified Hartzell . . . of discrimination towards Hispanic faculty."[59] In November 2020, Hartzell's administration allowed Plaintiffs to create the Equity Review Process Consultative Committee ("ERPCC") and appointed Martinez to this committee.[60] Per Plaintiffs, the committee's purpose "was to assess salary equity among professors and to work with an outside contractor, hired by Hartzell, that would analyze salary inequities."[61] Specifically, the ERPCC "would advise on how to use the [2020 FII] funds."[62]

---

[56] ROA.493, 510.
[57] *See* ROA.448–524; *see also* ROA.1166 (noting that UT Austin's President is involved only after a recommendation concerning a faculty member's "salary rate[]" is "forwarded" to him).
[58] ROA.1136 (emphasis added).
[59] ROA.463, ¶ 96.
[60] ROA.463, ¶¶ 96–97.
[61] ROA.463, ¶ 96.
[62] ROA.463, ¶ 96.

Plaintiffs state that Hartzell approved the ERPCC's recommended contractor at some point after the committee was formed.[63] They allege that, in February 2021, Hartzell "cancelled the contractor's work and disbanded the ERPCC."[64]

Yet despite being a assigned a time-sensitive task—advising on how to use the 2020 FII funds—Plaintiffs admit that the contractor had done no "substantive work" in the three months since the ERPCC's formation.[65] Plaintiffs do not allege when the 2020 FII funds were allocated.[66] Thus, it is unclear whether these funds had been distributed prior to February 2021, which would effectively moot the ERPCC's core purpose. Regardless, Plaintiffs admit that Hispanic professors received 2020 FII raises that greatly eclipsed their percentage of UT Austin's workforce.[67] They do not allege that they, or any other Hispanic professors, would have done better had the funds been allocated after the ERPCC drafted and submitted a report on pay inequities.

Third, in their 2019 report, Plaintiffs stated that the supposed pay disparities were due to "Hispanopia," a term they coined to refer to *unintentional*, not *intentional*, bias against Hispanics.[68] "Hispanopia" is not unique to UT Austin according to the Report. It is part of a larger "structural, traditional system" of "partial blindness" towards Hispanic issues—something that occurs "irrespective of any individuals' awareness of

---

[63] ROA.464, ¶ 98.
[64] ROA.464, ¶ 100.
[65] ROA.463–64, ¶¶ 96, 110.
[66] *See* ROA.462, ¶¶ 87–88.
[67] *See* ROA.426, ¶ 88; ROA.459, ¶ 68; ROA.977–78.
[68] *See* ROA.977–78.

it."[69]

## B.     An Overview of Plaintiffs' Disparate Promotions Claims.

Plaintiffs assert disparate promotions claims. They allege that the History Department created a procedure in 2019 that enabled professors to apply for certain leadership positions.[70] Yet Zamora does not state that he applied under this process, or that he wanted to apply but was otherwise deterred from doing so.[71]

Martinez, in contrast, alleges he wrote to "UT Administrators" to express his interest in being considered for certain positions.[72] Specifically, he claims he should have been, but was not, appointed to the following History Department positions: (1) Chair (April 2020);[73] (2) Associate Chair (May 2020);[74] (3) Interim Chair (June 2022);[75] and (4) Interim Chair (February 2023).[76]

Plaintiffs do not allege that Hartzell was involved in these "promotion" issues.[77] And while they complain that the History Department promoted individuals who did not apply to the open positions, they admit this was a common practice during the relevant period.[78]

---

[69] *See* ROA.977–78.
[70] ROA.468, ¶¶ 124–26.
[71] ROA.468–72, ¶¶ 124–51.
[72] ROA.468, ¶ 127.
[73] ROA.469, ¶ 131.
[74] ROA.470, ¶ 139.
[75] ROA.470, ¶ 141.
[76] ROA.471, ¶ 147.
[77] ROA.468–72, ¶¶ 124–51.
[78] *See* ROA.468–72, ¶¶ 124–51.

### C.    An Overview of Zamora's Endowment-Based Claim.

Zamora admits he received an "Endowed Chair position in 2022."[79] He claims he was previously "passed over and disregarded for endowed Professorships or an Endowed Chair."[80] Zamora does not specify what professorship or chair positions he is referring to or what the qualifications were for obtaining those positions.[81] He also does not allege that Hartzell was involved in any of the "endowment" decisions.[82]

### D.    An Overview of Plaintiffs' Retaliation Claims.

As confusing as it sounds, Plaintiffs assert that Defendants retaliated against them by *increasing* their salaries: "After Martinez and Zamora opposed Hispanic discrimination, UT increased both of their salaries, but not enough to eliminate the disparities with comparable non-Hispanic Professors."[83] Zamora also alleges he received "an Endowed Chair position" after his protected activity but complains that some "disparities still persist."[84]

As to Hartzell, Plaintiffs state they notified him about "discrimination towards Hispanic faculty" in or around August 2020.[85] Plaintiffs assert that they made other protected discrimination complaints, but they do not allege Hartzell was aware of these

---

[79] ROA.472, ¶ 153.
[80] ROA.472, ¶ 152.
[81] ROA.472, ¶¶ 152–54.
[82] *See* ROA.472, ¶¶ 152–54.
[83] ROA.466, ¶ 112.
[84] ROA.472, ¶ 153.
[85] ROA.463, ¶ 96.

matters.[86]

### III. Plaintiffs' OFCCP Charges, and the OFCCP's Decisions on Those Charges

Plaintiffs filed administrative charges with the Office of Federal Contract Compliance Programs.[87] After a two-year investigation, the OFCCP found that UT Austin "did not discriminate against the complainant[s] based on [their] race and/or national origin."[88] The OFCCP reviewed Plaintiffs' 2019 report "and decided the [report's] analysis presents conclusions that are invalid due to a faulty methodology."[89] The OFCCP "conducted an independent regression analysis . . . and found no disparity against Hispanic faculty at any rank."[90]

The OFCCP analyzed relevant records and interviewed UT Austin officials, which led it to conclude that "Hispanic faculty have long histories of appointments to positions of leadership."[91] Thus, the OFCCP "did not find evidence of professors being underpaid [or] failing to be promoted due to their race/ethnicity."[92]

As to Martinez, the OFCCP "confirmed that [he] received pay increases commiserate [sic] with his positions and has been appointed to serve in several prestigious committees, including those convened to consider issues of faculty salary

---

[86] *See* ROA.457–58, ¶¶ 57–62; ROA.459, ¶¶ 67–72; ROA.463, ¶ 93; ROA.472, ¶ 150; ROA.485, ¶ 221; ROA.492–96, 507–12.
[87] ROA.492–96, 507–12.
[88] ROA.514–16, 520–21.
[89] ROA.514–16, 520–21.
[90] ROA.514–16, 520–21.
[91] ROA.514–16, 520–21.
[92] ROA.514–16, 520–21.

and equity."[93] For Zamora, the OFCCP "found that [he] received pay increases commiserate [sic] with his appointed positions."[94]

## IV. An Overview of the Trial Court's Decision on Defendants' Motion to Dismiss

Defendants filed a motion to dismiss Plaintiffs' claims and to strike their class action allegations. The trial court granted this motion in part and dismissed Plaintiffs' Title VII retaliation claims and the § 1981 claims against Hartzell in his official capacity.[95] The court also struck Plaintiffs' class action allegations and denied Plaintiffs' motion to exclude one of Defendants' exhibits.[96] Plaintiffs did not challenge the other exhibits attached to Defendants' motion to dismiss.

The district court denied Defendants' motion to dismiss as to Plaintiffs': (1) Title VII disparate impact claims, which are not at issue in this appeal; (2) Title VII disparate treatment claims; and (3) § 1981 claims against Hartzell in his individual capacity.[97] On the disparate treatment question, the court recognized that Plaintiffs asserted in their 2019 report "that the employment disparities are a result of unintentional discrimination."[98] Yet the court still found that Plaintiffs plausibly alleged claims for intentional discrimination.[99]

---

[93] ROA.516.
[94] ROA.521.
[95] ROA.1536.
[96] ROA.1496–97, 1536.
[97] ROA.1499–1525.
[98] ROA.1506.
[99] ROA.1506–09.

As to the § 1981 individual-capacity claims, the court seemingly found that Plaintiffs adequately pleaded disparate treatment-type claims, along with disparate impact- and retaliation-type claims.[100] But Plaintiffs did not plead § 1981 disparate impact claims,[101] and as the court dismissed Plaintiffs' identical Title VII retaliation claims.[102] Also on the § 1981 issue, the court ruled that Plaintiffs adequately alleged that Hartzell was "essentially the same" as UT Austin and that he was personally involved in the alleged unlawful conduct.[103]

## STANDARD OF REVIEW

A Rule 12 (b)(6) motion to dismiss turns on whether the plaintiff pleaded a "plausible" (as opposed to just a "possible") claim for relief.[104] This Court "reviews de novo a district court's grant or denial of a Rule 12(b)(6) motion to dismiss."[105]

## SUMMARY OF THE ARGUMENT

First, Plaintiffs must plausibly allege that Hartzell was "personally involved" in the alleged unlawful conduct for him to be individually liable in this context. They do not plausibly allege that he was, so Hartzell remains protected by qualified immunity.

Most notably, Plaintiffs appear to rely on a "deliberate indifference" theory of liability. But deliberate indifference is a high bar, and Plaintiffs do not meet it. Indeed,

---

[100] *See* ROA.1519–20.
[101] *See* ROA.486–87, ¶¶ 226–35.
[102] ROA.1509–15,
[103] ROA.1520–24.
[104] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[105] *Whitley v. BP, P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016) (quotations omitted).

after becoming aware of the alleged pay inequities, Hartzell awarded $1.7 million in equity raises to UT Austin faculty. Plaintiffs admit that 18% of this fund ($306,000) went towards Hispanic faculty; a percentage far larger than their representation in UT Austin's workforce (7%). Also, Plaintiffs acknowledge that Hartzell and other UT Austin officials "conduct[ed] university-wide reviews and studies of compensation for faculty, including Hispanic faculty, and ma[de] alleged university-wide compensation decisions, adjustments, and raises."[106] This is the opposite of deliberate indifference.

Second, Plaintiffs' § 1981 claims against Hartzell are barred by qualified immunity as his liability under this statute was not clearly established. The Fifth Circuit has left it unclear whether a state actor like Hartzell can be individually liable under § 1981. While the Court has indicated that a defendant can be individually liable if he is "essentially the same" as the employer for purposes of the unlawful conduct, it has done so only in dicta. And there is no Fifth Circuit caselaw addressing conduct sufficiently akin to Hartzell's and finding that it supported § 1981 individual liability.

Third, Plaintiffs do not plead plausible disparate treatment claims. They admit that their claim is one for unintentional discrimination, which is not viable under a disparate treatment theory. And Plaintiffs do not plausibly show they were intentionally discriminated against because of their race or national origin.

Fourth, the trial court properly dismissed Plaintiffs' Title VII retaliation claims

---

[106] ROA.467, ¶ 120.

against UT Austin. Yet it mistakenly allowed Plaintiffs' identical § 1981 retaliation claims against Hartzell to go forward.

Fifth, the trial court recognized § 1981 disparate impact claims for Plaintiffs. But Plaintiffs do not plead such a claim, and a § 1981 disparate impact claim is foreclosed by Fifth Circuit precedent.

Finally, Plaintiffs' Title VII claims against UT Austin are inadequately pleaded for the same general reasons as their § 1981 claims against Hartzell, as the same elements govern both claims.

## ARGUMENT

## I.    Plaintiffs' § 1981 Claims are Barred by Qualified Immunity.

### A.    An Overview of the Qualified Immunity Doctrine.

Qualified immunity applies to the § 1981 claims against Hartzell in his individual capacity.[107] "The qualified immunity defense generally has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation."[108] "If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were objectively reasonable in light of law which was clearly established at the time of the disputed

---

[107] *See Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003) (explaining that §§ 1981 and 1983 are both subject to the defense of qualified immunity).
[108] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

action."[109] "Clearly established law comes from holdings, not dicta."[110] The plaintiff has the burden to negate a properly raised qualified immunity defense.[111]

To overcome qualified immunity, it must also be clearly established that individual liability attaches to a public official given the nature of the claim at issue and the official's level of involvement in the alleged unlawful act. For instance, in *Sims v. City of Madisonville*, the Fifth Circuit found that qualified immunity protected a defendant as the Court's precedent was "inconsisten[t] . . . on whether First Amendment liability can attach to a public official who did not make the final employment decision."[112] In *Diaz v. Cantu*, the Fifth Circuit found that commissioner court members retained their qualified immunity as it was not clearly established that bystander liability applied outside of the law enforcement context.[113] The court reasoned that "these officials were not on notice that they had a duty to intervene even if they might have had clear notice . . . that [the plaintiff's] rights were being violated."[114] And in *Atkins v. Hopkins*, the Fifth Circuit found that an official who did not recommend the plaintiff's termination or otherwise set the termination "in motion" was entitled to qualified immunity.[115] In doing so, the Court noted that the caselaw "did not clearly establish the violative nature of [the official's] *particular* conduct" and that the precedent "would not have let [the

---

[109] *Id.* (quotations omitted).
[110] *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019).
[111] *Collier v. Montgomery*, 569 F.3d 214, 217–18 (5th Cir. 2009).
[112] 894 F.3d 632, 641 (5th Cir. 2018).
[113] 123 F.4th 736, 750 (5th Cir. 2024).
[114] *Id.*
[115] 137 F.4th 286, 290–91 (5th Cir. 2025).

official] know that he was violating the plaintiff's constitutional rights" when he committed the alleged unlawful act.[116]

### B.  Qualified Immunity Bars Plaintiffs' § 1981 Claims Against Hartzell.

There are two main reasons why qualified immunity protects Hartzell. First, Plaintiffs did not plead plausible § 1981 claims against him. Second, it was not clearly established that Hartzell could be individually liable under § 1981.

### 1.  Plaintiffs Did Not Plausibly Allege that Hartzell was Personally Involved in the Alleged Unlawful Acts.

Plaintiffs brought their § 1981 claims through § 1983, as binding precedent requires.[117] Personal involvement is an "essential element" of a § 1983 claim.[118] A plaintiff must "specify the personal involvement of each defendant . . . [and] cannot make generalized allegations, nor can he support a claim based on any vicarious liability theory."[119] Plaintiffs do not appear to contend that Hartzell overtly and personally participated in the violation of their rights—nor could they. Instead, Plaintiffs seemingly try to hold Hartzell personally liable on theories of deliberate indifference and ratification.[120] But Plaintiffs' allegations do not create a plausible inference of liability

---

[116] *Id.* at 291 (quotations and brackets omitted).

[117] *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36 (1989).

[118] *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983); *see also Foley*, 355 F.3d at 338 (citing with approval a Third Circuit decision— *Al–Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986)—that analyzed § 1981 liability in terms of whether the defendants "were personally involved in the discrimination action"); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement.") (quotations omitted).

[119] *Murphy v. Kellar*, 950 F.2d 290, 292 n.7 (5th Cir. 1992).

[120] *See, e.g.*, ROA.473, ¶ 157; ROA.475, ¶¶ 167–68; ROA.478, ¶¶ 178; ROA.482, ¶ 198.

under either theory. Qualified immunity thus bars Plaintiffs' § 1981 claims as Plaintiffs do not plausibly allege that Hartzell was personally involved in the alleged unlawful acts.[121]

A defendant can be liable under § 1983 if he overtly and personally participates in the violation of the plaintiff's rights.[122] But again, Plaintiffs do not appear to rely on this theory. As to pay and promotion decisions, HOP 2-2160 shows that UT Austin's President is only involved when the Budget Council or Department Chair forwards him a recommendation regarding a particular professor.[123] Plaintiffs do not allege that any recommendations concerning themselves were forwarded to Hartzell for review.

As to endowments, HOP 2-2440 shows that Hartzell delegated his authority on such issues to the Executive Vice President and Provost.[124] This policy also states that "[t]he provost (or designee) approves initial and continuing appointments of holders to chairs/professorships."[125] Regardless of the above, Plaintiffs identify only one specific endowment position in their amended complaint, and they admit that Zamora received that position.[126] Thus, even if Hartzell was somehow personally involved in this appointment, it would not be considered "discriminatory."

To the extent they claim deliberate indifference, Plaintiffs face "a significantly

---

[121] *Banks v. Herbrich*, 90 F.4th 407, 417–18 (5th Cir. 2024) (finding that an official was entitled to qualified immunity due to her lack of personal involvement).
[122] *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008).
[123] ROA.1166.
[124] ROA.1170.
[125] ROA.1170.
[126] ROA.472.

high burden."[127] Even gross negligence is not enough.[128] Rather, the plaintiff must show that the defendant "disregarded a known or obvious consequence of his action."[129] The defendant's "actual knowledge is critical," and he cannot be liable just because he "fail[ed] to alleviate a significant risk that he should have perceived but did not."[130] Plaintiffs' allegations fall far short of this standard.

To start, Plaintiffs do not adequately plead Hartzell's subjective knowledge of the supposed discriminatory acts. To be liable in this context, the plaintiff must show that the defendant had subjective knowledge of unlawful acts by the "relevant subordinate."[131] Knowledge of misconduct by a different person is insufficient.[132]

Here, the relevant subordinates are Plaintiffs' Dean and Department Chair, as these are the individuals who made the supposed discriminatory decisions.[133] But Plaintiffs do not allege that they advised Hartzell that their Dean and Department Chair were discriminating against Hispanics. Rather, they merely state that certain committees they were on sent Hartzell a "communication on pay discrimination" on August 3, 2020.[134] Plaintiffs' deliberate indifference claims fail as they do not allege that Hartzell

---

[127] *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Services*, 380 F.3d 872, 882 (5th Cir. 2004).

[128] *Id.*

[129] *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997).

[130] *Whitley v. Hanna*, 726 F.3d 631, 641 (5th Cir. 2013) (quotations omitted).

[131] *Doe v. Ferguson*, 128 F.4th 727, 736 (5th Cir. 2025).

[132] *Id.*

[133] *See* ROA.493, 510, 1135; *see also* ROA.1136 (noting the History Department's Salary Committee's role in awarding merit raises); ROA.1165–67 (discussing the evaluation process for pay and promotion decisions).

[134] ROA.463, ¶¶ 93–94.

was subjectively aware that their Dean and Department Chair were discriminating against Hispanic professors.[135]

At the least, Hartzell cannot be liable for acts that occurred prior to August 3, 2020—the date Plaintiffs first informed him about the supposed discrimination.[136] Also, Plaintiffs only allege that they notified Hartzell about "*pay* disparities of Hispanic faculty."[137] They do not contend that he was subjectively aware of discrimination in the fields of promotions or endowments, as they must to hold Hartzell liable for such issues under a deliberate indifference theory.

Further, "[a]n official with subjective knowledge of a risk may still be free from liability if he or she responded reasonably to the risk, even if the harm ultimately was not averted."[138] Plaintiffs' amended complaint confirms that Hartzell responded reasonably to their notice regarding alleged pay disparities.

Plaintiffs acknowledge that, after they informed Hartzell of pay issues concerning Hispanics, his administration had $306,000 in equity raises distributed to Hispanic faculty.[139] This was 18% of the total pool of equity funds ($1.7 million); a percentage more than double the percentage of Hispanic professors in UT Austin's workforce

---

[135] *See Ferguson*, 128 F.4th at 736.

[136] *See* ROA.463, ¶¶ 93–94. Plaintiffs state that the "Executive Committee of UT's Faculty Council" sent Hartzell a report on July 27, 2020. ROA.462, ¶ 89. But they allege that it only discussed funding issues regarding certain academic programs. ROA.462–63, ¶¶ 90–91.

[137] ROA.463, ¶¶ 93–94 (emphasis added).

[138] *Perniciaro v. Lea*, 901 F.3d 241, 257 (5th Cir. 2018).

[139] ROA.426, ¶ 88.

(7%).[140] Plaintiffs also admit that Hartzell and other UT Austin officials "conduct[ed] university-wide reviews and studies of compensation for faculty, including Hispanic faculty, and ma[de] alleged university-wide compensation decisions, adjustments, and raises."[141] Plaintiffs may believe these investigations and raise initiatives did not fully cure Hispanic professors' pay inequity issues. But that is a far cry from Hartzell being *deliberately indifferent* on the subject.[142]

Finally, to be liable under a ratification theory, the defendant must "approve a subordinate's decision and the basis for it."[143] Plaintiffs did not allege that Hartzell approved *any* pay, promotion, or endowment decisions concerning them. This alone defeats any ratification-based theory of liability. Also, to establish individual liability in this context, Plaintiffs must show that Hartzell "ratified a subordinate's decision specifically because of racial [or national origin] animus."[144] They offer no allegations on this point.

### 2.  There was No Clearly Established Law Showing that Hartzell Could be Individually Liable Under § 1981.

Fifth Circuit precedent leaves it unclear when a state actor like Hartzell can be individually liable for a § 1981 claim brought via § 1983. At the least, the confusing (and

---

[140] ROA.426, ¶ 88; ROA.910; *see also* ROA.459.

[141] ROA.467, ¶ 120.

[142] *See Hernandez ex rel. Hernandez*, 380 F.3d at 884 ("While Lilly may arguably have been negligent in conducting an incomplete background investigation of the Clauds prior to placing Eric in the Clauds' foster home, the very high standard of deliberate indifference cannot be inferred from negligence alone.").

[143] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009) (quotations omitted).

[144] *See Allen v. Hays*, 65 F.4th 736, 749 n.10 (5th Cir. 2023); *see also id.* at 750.

sometimes conflicting) caselaw on this point did not clearly establish that Hartzell could be personally liable given his limited involvement in the alleged discriminatory acts.

To prevail under § 1981, a plaintiff must show that: "(1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, such as the making and enforcing of a contract."[145] Binding precedent holds that a § 1981 claim against a state actor must be pursued through § 1983.[146] "The elements of claims under Title VII and 42 U.S.C. § 1981 are identical."[147] Thus, the Fifth Circuit "evaluate[s] both claims using the same analysis."[148]

That said, § 1981 claims differ from Title VII in one way relevant here. Under Title VII, "it is well established that individuals are not liable . . . in either their individual or official capacities."[149] But the § 1981 caselaw is far less clear on the "individual liability issue," as detailed below.

> **(a)    Fifth Circuit Precedent Leaves it Unclear When a Defendant can be Individually Liable Under § 1981.**

This Court's prior decisions do not clearly establish whether, and under what circumstances, a person can be individually liable for a § 1981 claim brought via § 1983.

---

[145] *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931 (5th Cir. 2021).

[146] *Jett*, 491 U.S. at 735–36; *Felton*, 315 F.3d at 481.

[147] *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 n.1 (5th Cir. 2001); *see also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 935 (1982) ("[S]tate employment is generally sufficient to render the defendant a state actor . . . .").

[148] *Pratt*, 247 F.3d at 606 n.1.

[149] *Weathers v. Houston Methodist Hosp.*, 116 F.4th 324, 328 n.2 (5th Cir. 2024) (quotations and brackets omitted).

### (i)    Analysis of the Pre-Foley Case Law.

The Fifth Circuit's decision in *Foley v. Univ. of Houston Sys.*[150] is the most germane case to the § 1981 personal liability issues in question here. That said, the pre-*Foley* case law gives necessary context to *Foley's* decision and helps show how unsettled the Fifth Circuit's case law is on this subject.

***Faraca v. Clements* (1975):** In *Faraca*, the plaintiff sought employment with the Georgia Retardation Center, a state entity created by the Georgia General Assembly.[151] A supervisor (Mills) interviewed Faraca and wanted to hire him.[152]

Mills would normally have been the effective decisionmaker on a hiring decision like this.[153] But the Center's director (Clements) had ordered Mills to notify him regarding "controversial" applications.[154] And the hiring of Faraca was potentially controversial as he was a white man married to a black woman.[155]

Once notified, Clements believed the hiring of Mills was too politically sensitive.[156] Thus, he had Mills reject Faraca's application for the position in question.[157] Faraca then sued Clements under § 1981.[158] The district court found that Clements' acts

---

[150] 355 F.3d at 337–41.
[151] *Faraca v. Clements*, 506 F.2d 956, 957 (5th Cir. 1975).
[152] *Id.* at 958.
[153] *Id.* at 957–58.
[154] *Id.* at 958 n.7.
[155] *Id.* at 957.
[156] *Id.* at 958.
[157] *Id.*
[158] *Id.* at 957–58.

were racially discriminatory and held him personally liable for damages.[159]

On appeal, Clements argued that § 1981 "was only intended to proscribe a breach of contract, not . . . the refusal to enter into a contract."[160] The Court's analysis of this issue led to a discussion of personal liability under § 1981.

*Faraca* stated that "'the right to contract for employment (is) a right secured by 42 U.S.C. § 1981'."[161] The Court noted that, "[t]echnically, the State of Georgia was the prospective employer and only it would be in a position to refuse to enter into a contract."[162] But it found that Clements could still be individually liable under § 1981, citing caselaw holding that "a third party's interference with those rights guaranteed under Section[] 1981 . . . will subject such a person to personal liability."[163] The Fifth Circuit affirmed the decision to hold Clements personally liable under § 1981.[164]

***Jett v. Dallas Indep. Sch. Dist.*** **(1989):** In *Jett*, the U.S. Supreme Court held that § 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."[165] Thus, a plaintiff's § 1981 claim against a state actor is subject to the limitations inherent to § 1983 actions, such as the principle that a defendant cannot be liable under a *respondeat*

---

[159] *Id.* at 957.
[160] *Id.* at 958.
[161] *Id.* (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 443 (1968)).
[162] *Id.* at 959.
[163] *Id.*
[164] *Id.* at 957–60.
[165] 491 U.S. at 735–36.

*superior* theory.[166]

*Jett* cast serious doubts on *Faraca's* analysis. *Faraca* allowed a state actor to be individually liable under a § 1981 claim. *Jett* showed that such a claim is not viable and must instead be brought under § 1983. *Faraca* also focused on whether the state actor could be personally liable under § 1981. *Jett* shows that § 1983 principles are critical to assessing personal liability in the state-actor context.

**Bellows v. Amoco Oil Co.** **(1997):** In *Bellows*, the Fifth Circuit elaborated on *Faraca*. The Court stated that *Faraca* did not hold that *all* third-party interference claims are actionable under § 1981.[167] Rather, the Fifth Circuit noted that the director in *Faraca* "was acting on behalf of the state when he decided not to hire Faraca—thus making his hiring decision indistinguishable from that of the state—the director and the state were essentially one and the same."[168]

*Bellows'* analysis of individual liability under § 1981 was dicta. The Fifth Circuit stated that "[s]ince *Faraca,* this Court has not offered any opinion as to whether *all* third party interference claims are actionable under section 1981, and we decline to rule on this issue today."[169] The Court left that issue "for another day" as the plaintiff's § 1981 claim failed on independent grounds.[170] *Bellows* involved a standalone § 1981 claim.[171]

---

[166] *Id.* at 736.
[167] *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997).
[168] *Id.*
[169] *Id.*
[170] *Id.* at 274–75.
[171] *Id.* at 273.

*Bellows* did not concern state actors or a § 1981 claim asserted via § 1983.[172]

***Oden v. Oktibbeha Cnty., Miss.*** **(2001):** In *Oden v. Oktibbeha Cnty., Miss.*, the plaintiff brought a standalone § 1981 claim for damages against a county sheriff.[173] The sheriff argued that he could not be personally liable under § 1981 as he acted in his official capacity.[174] The Fifth Circuit explained that, "[w]hile the Supreme Court has extended § 1981 liability to cases involving private employment contracts, it has not imposed personal liability on elected officials for discrimination in the terms and conditions of local government employment contracts."[175] The Court dismissed the claims against the sheriff: "when a plaintiff asserts a cause of action under § 1981 for discrimination in the terms and conditions of a municipal employment contract, the proper defendant is the government employer in his official capacity."[176]

*Oden* left open two main questions. First, can state actors be individually liable under § 1981 for acts taken on behalf of their state or municipal employers? *Faraca* said "yes," and *Bellows* effectively agreed (in dicta) with this decision. *Oden* said "no," and it did so without ever citing, much less differentiating, *Faraca* or *Bellows*.

Second, what standards apply when assessing personal liability for a § 1981 claim brought under § 1983? Is individual liability analyzed only under § 1983 liability

---

[172] *See id.* at 270–73.
[173] 246 F.3d 458, 462 (5th Cir. 2001).
[174] *Id.* at 464.
[175] *Id.* (citing *Brown v. General Servs. Admin.*, 425 U.S. 820, 835 (1976)).
[176] *Id.*

principles, like personal involvement, deliberate indifference, and so on? Or does § 1981 create an additional burden a plaintiff must meet, such as the "essentially one and the same" standard *Bellows* acknowledged? As shown below, the post-*Oden* caselaw does not meaningfully answer these questions.

***Felton v. Polles* (2002):** In *Felton v. Polles*, one of the plaintiffs (Carter, a state employee) asserted a standalone § 1981 claim against his supervisor and alleged discriminator (Thomas).[177] The Fifth Circuit found that Thomas could not be personally liable under § 1981.

*Felton's* analysis did not meaningfully clarify the state of individual liability under § 1981. To begin, the Fifth Circuit stated that Carter's contract was not technically with Thomas and that it was "not clear" whether § 1981 liability "lies against an individual defendant not a party to the contract giving rise to the claim."[178]

Further, the Court read *Bellows* and *Faraca* as showing that "Thomas could *only* be amenable to § 1981 liability *if* he were 'essentially the same' as the State for purposes of the complained-of conduct."[179] *Felton* then added that Thomas "does not appear to be" essentially the same as his state employer, although it did not decide the issue.[180]

*Felton's* comment about Thomas likely not being "essentially the same" as his

---

[177] 315 F.3d 470, 479, 482 (5th Cir. 2002) *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).
[178] *Id.* at 480.
[179] *Id.* at 480–81.
[180] *Id.* at 481 (emphasis omitted).

employer appears to conflict with the result in *Faraca*. Thomas directly participated in the alleged discriminatory acts as he: (1) denied Carter's request for leave, even though Carter's prior supervisor approved that request; (2) gave Carter a low performance evaluation that led to his placement on a performance improvement plan; and (3) made discriminatory comments ("I'm going to get that n***er") to a coworker about Carter.[181] Like the director in *Faraca*, Thomas committed the alleged discriminatory acts while carrying out his job duties. It makes little sense that one would be considered "essentially the same" as the state employer and the other would not be.

*Felton* acknowledged that *Oden* "further complicated" the analysis of whether a § 1981 discrimination claim could be brought against Thomas in his individual capacity.[182] The Court found that *Oden's* holding that the municipal employer is the proper defendant in a § 1981 discrimination claim applies equally to cases involving state employers.[183]

Finally, *Felton* also found that "Carter's independent § 1981 claim—*not* brought through § 1983—against Thomas in his individual capacity is contrary to *Jett*."[184] Yet the Court's analysis on this point did not clarify whether or when a state actor can be personally liable for a § 1981 claim asserted via § 1983.[185]

### (ii)   Analysis of *Foley v. Univ. of Houston Sys.*

---

[181] *Id.* at 476.
[182] *Id.* at 481.
[183] *Id.*
[184] *Id.*
[185] *See id.* at 481–83.

*Foley v. Univ. of Houston Sys.* (2003) is the last, and most relevant, Fifth Circuit case pertinent to the § 1981 personal liability issues. There, two plaintiffs (Foley and Hutto) were tenured faculty members at the University of Houston – Victoria's Education Division.[186] Each plaintiff asserted § 1981 retaliation claims brought under § 1983.[187]

On appeal, Hutto had a live § 1981 retaliation claim against Cheryl Hines (the Chair of UHV's Education Division), Diane Prince (a former Chair of the Education Division), Paul Carlson (a professor in the Education Division), Karen Haynes (UHV's President), and Don Smith (UHV's Provost).[188] Foley's live § 1981 retaliation claim was only against Prince and Carlson.[189]

To understand *Foley's* impact on the instant qualified immunity analysis, it helps to distinguish the Court's dicta from its holdings.

***Foley's* Dicta:** The *Foley* defendants raised two arguments for why qualified immunity should bar the plaintiffs' § 1981 claims. First, they maintained that "§ 1981 conferred no clearly established right against retaliation."[190] Second, they contended that "the district court . . . failed to determine what specific unlawful acts of retaliation were committed and whether reasonable public officials in the positions of the Appellants knew or should have known that such acts violated clearly established

---

[186] *Foley*, 355 F.3d at 335.
[187] *Id.* at 336, 340 n.9.
[188] *Id.* at 336–37.
[189] *Id.*
[190] *Id.* at 338; *see also* Appellants' Brief, 2002 WL 32442928, at *3, 23–44.

rights."[191]

Before analyzing these arguments, the Fifth Circuit discussed whether the defendants were even "subject to liability in the first place" under § 1981.[192] The Court, citing *Felton* and *Bellows*, noted that it "ha[s] . . . accepted that § 1981 liability will lie against an individual defendant if that individual is 'essentially the same' as the State for the purposes of the complained-of conduct."[193] *Foley* stated that "the district court found genuine issues of material fact as to whether [Defendants] exercised control over the faculty positions and titles held by Dr. Foley and Dr. Hutto."[194] The Court continued that if Defendants did exercise such control, then they were "'essentially the same' as UHV for purposes of the retaliatory conduct in this case."[195]

The Fifth Circuit then acknowledged that "there is tension between [*Bellows* and *Oden*] with respect to the liability of individual defendants who are not parties to the employment contract."[196] But the Court declined to resolve the confusion over § 1981 individual liability: "[W]e do not believe that this is the proper case in which to decide the outer boundaries of § 1981 liability as it applies to individual non-employer defendants, nor to attempt to catalogue every fact situation which might subject an individual to such liability."[197] Thus, the Court assumed qualified immunity was

---

[191] *Foley*, 355 F.3d at 338; Appellants' Brief, 2002 WL 32442928, at *3, 23–44.
[192] *Foley*, 355 F.3d at 337–41.
[193] *Id.* at 337 (quotations omitted).
[194] *Id.*
[195] *Id.* at 337–38 (citing *Al-Khazraji*, 784 F.2d at 518; *Bellows*, 118 F.3d at 274).
[196] *Id.* at 338.
[197] *Id.*

properly at issue and proceeded to analyze whether the individual defendants were entitled to this defense.[198] This gets to *Foley's* actual holdings.

*Foley's* **Holdings:** There were two overarching holdings to *Foley*. First, the Court held that qualified immunity barred Hutto's § 1981 retaliation claim, finding that her cited adverse acts fell short of "ultimate employment decisions."[199]

Second, *Foley* affirmed the trial court's decision to send Foley's § 1981 retaliation claim against Prince and Carlson to trial.[200] In doing so, the Fifth Circuit rejected Prince's and Carlson's argument that § 1981 conferred no clearly established right against retaliation.[201] The Court noted that there was a genuine dispute as to whether Prince and Carlson expressed hostility towards Foley's discrimination complaint and whether they worked together to undermine Foley's standing and deny him a promotion.[202] The Fifth Circuit held that these facts, if true, would be sufficient to establish the "causal connection" element needed for a *prima facie* retaliation claim.[203]

*Foley's* **"Essentially the Same" Analysis is Dicta:** The Fifth Circuit considers a statement to be dictum "if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."[204] "A statement is not dictum

---

[198] *Id.* at 338–41.
[199] *Id.* at 340–41.
[200] *Id.* at 338–40.
[201] *Id.*
[202] *Id.* at 340.
[203] *Id.* at 339–40.
[204] *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) (quotations omitted).

if it is necessary to the result or constitutes an explication of the governing rules of law."[205]

*Foley's* "essentially the same" analysis should be considered as dicta:

- The parties in *Foley* did not brief on appeal (1) the "essentially the same" issue or (2) whether only a government employer can be liable under § 1981.[206]

- *Foley's* individual liability analysis largely turned on its statement that "the district court found genuine issues of material fact as to whether the [defendants] exercised control over the [plaintiffs'] faculty positions and titles."[207] The trial court's orders in *Foley* show, however, that it made no findings on this point.[208]

- *Foley* recognized the "tension" between *Bellows* and *Oden* on the § 1981 individual liability issues and declined to resolve the discrepancy.[209]

- *Foley* stated that *Oden's* holding was limited to *municipal* § 1981 defendants.[210] This overlooked *Felton's* finding from a year prior that there is "no reason" why *Oden* should not extend to *state* § 1981 defendants.[211]

- *Foley* was able to fully analyze the defendants' actual qualified immunity arguments without ever mentioning the "essentially the same" issue.[212]

*Foley* may not have fully considered the unbriefed § 1981 personal liability issue, and the Court expressly declined to resolve the tension between *Bellows* and *Oden*. The Court's

---

[205] *Id.*

[206] *See* Appellants' Brief, 2002 WL 32442928, at *3, 23–44; Appellees' Brief, 2002 WL 32442930, at *3, 10–31; Appellants' Reply Brief, 2002 WL 32442929, at *1–5.

[207] *Foley*, 355 F.3d at 337.

[208] *See* Appendix 67–94. This cite contains the following documents from *Foley v. Univ. of Houston Sys.*, 6:99-cv-00047 (S.D. Tex.): (1) the trial court's September 30, 2001 order on summary judgment; (2) the trial court's order on the defendants' motion to alter or amend a judgment, entered on November 19, 2001; and (3) the defendants' December 17, 2001 notice of appeal.

[209] 355 F.3d at 337.

[210] *Id.* at 338 n.6.

[211] *Felton*, 315 F.3d at 481.

[212] *See* 355 F.3d at 338–41.

"essentially the same" analysis was also not pertinent to the defendants' actual qualified immunity arguments. Thus, *Foley's* "essentially the same" analysis is dicta.

### (b)    The Precedent Above does Not Clearly Establish that Hartzell Could be Individually Liable Under § 1981.

Qualified immunity protects Hartzell as it was not clearly established that his alleged actions would subject him to individual liability under § 1981.

First, it was not clearly established that a state actor could be personally liable under § 1981 for acts taken while carrying out his job duties. *Oden* held that, for municipal actors, the proper § 1981 defendant is the municipal employer.[213] And *Felton* stated that *Oden's* holding applies equally to cases involving state actors.[214] True, *Foley* leaned the other way on this issue.[215] But it did so only in dicta. And in this Circuit, clearly established law must come from holdings, not dicta.[216]

Second, in *Bellows*, *Felton*, and *Foley*, the Fifth Circuit suggested that an "essentially the same" inquiry is necessary to an analysis of personal liability under § 1981. But each case's discussion on this issue came in the form of dicta, not binding holdings.[217]

Finally, the caselaw does not clearly establish what a § 1981 defendant must do to be considered "essentially the same" as his employer. *Foley* opined that a defendant who "exercised control" over an employee's "position[] and title[]" is essentially the

---

[213] 246 F.3d at 464.
[214] 315 F.3d at 481.
[215] 355 F.3d at 337–38.
[216] *Morrow*, 917 F.3d at 875.
[217] *Supra*, 30–37.

same as the employer.[218] But the Court did not explain what specific actions the individual defendants took that warranted a finding that they "exercised control" over the plaintiffs.

*Foley's* lack of elaboration on this issue poses a problem for government actors trying to figure out whether they could be individually liable under § 1981. *Felton* indicates that not *all* acts that "control," in some way, a plaintiff's employment warrant § 1981 liability. There, the supervisor (1) denied the plaintiff's request for leave and (2) gave the plaintiff a bad performance review that led to his placement on a performance improvement plan.[219] Yet the Court still noted that the supervisor "does not appear to be" essentially the same as the state employer under § 1981.[220]

To overcome Hartzell's qualified immunity, it generally must be clearly established that § 1981 liability can attach to him under the circumstances here.[221] Neither Plaintiffs nor the district court pointed to § 1981 caselaw clearly showing that he would be considered "essentially the same" as UT Austin given his limited involvement in the alleged unlawful acts.[222] Hartzell retains his qualified immunity.

## II.    Plaintiffs' § 1981 Claims Fail on Plausibility Grounds.

### A.    Unintentional Discrimination is Not Cognizable Under a Disparate Treatment Theory.

---

[218] 355 F.3d at 337–38.

[219] *Felton*, 315 F.3d at 476.

[220] *Id.* at 481 (emphasis omitted).

[221] *See Sims*, 894 F.3d at 641; *see also Atkins*, 137 F.4th at 290–91; *Diaz*, 123 F.4th at 750.

[222] *See* ROA.1259–1321, 1488–1536.

A disparate treatment claim must be based on "*intentional* discrimination."[223] The Fifth Circuit recently reiterated that "'[d]isparate treatment' is 'deliberate discrimination'" and that "[w]ith discriminatory treatment claims, there can be no liability without a finding that the protected trait (*e.g.*, race) motivated the challenged action."[224] *Iqbal* made a similar point, finding that intentional discrimination "involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' the action's adverse effects upon an identifiable group."[225]

Yet Plaintiffs' disparate treatment claims are for *unintentional*, not *intentional*, discrimination. In their 2019 report, they stated that the alleged pay disparities were due to "Hispanopia," a term they created to refer to *unintentional* bias against Hispanics.[226] Plaintiffs also lamented that UT Austin employees' "habits" towards inequitable pay issues were hard to change as these employees presumably "*are so very sure that personally they are not racist, not even remotely*, such that they just do not see the problem at all."[227]

Plaintiffs' 2018 report likewise shows that their claims are based on alleged unintentional discrimination. There, they cited "pay compression" as a main cause of salary inequities.[228] And they admitted that "pay compression" derives not from intentional bias, but rather from market forces that lead to new faculty often getting

---

[223] *Okeke v. Administrators of Tulane Educ. Fund*, No. 21-30451, 2022 WL 1025991, at *6 (5th Cir. Apr. 6, 2022); *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988).

[224] *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 909–10 (5th Cir. 2019).

[225] 556 U.S. at 676–77 (quotations and brackets omitted).

[226] ROA.977–78.

[227] ROA.971 (emphasis added).

[228] ROA.1132.

hired at salaries exceeding the salaries of longer serving professors.[229]

Plaintiffs have pleaded themselves out of court. They expressly allege that their pay, promotion, and endowments were affected by unintentional discrimination. This Court therefore should hold that Plaintiffs did not plausibly allege that their race or national origin motivated the challenged pay, promotion, and endowment decisions.

Below, Defendants discuss additional reasons why Plaintiffs' disparate pay, promotions and endowment claims are inadequately pleaded.

## B.    An Overview of the Disparate Treatment Pleading Standard and the *McDonnell Douglas* Framework.

"[T]here are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an adverse employment action, (2) taken against a plaintiff *because of* her protected status."[230] When, as here, a plaintiff's claim turns on circumstantial evidence,[231] the plaintiff "will ultimately have to show that he can satisfy the *McDonnell Douglas* framework."[232] The Fifth Circuit considers the *McDonnell Douglas* framework to be "helpful to reference" when determining whether a plaintiff pleaded the ultimate elements of a disparate treatment claim.[233]

Under *McDonnell Douglas*, a plaintiff asserting disparate pay must show: (1) he was a member of a protected class; (2) he was paid less than a non-member for work

---

[229] ROA.1132–33, 1150; *see also* ROA.949.

[230] *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (quotations omitted).

[231] Plaintiffs did not allege facts that could be considered "direct evidence" of discrimination. *See Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018).

[232] *Cicalese*, 924 F.3d at 767.

[233] *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016).

requiring substantially the same responsibility; and (3) his circumstances are "nearly identical" to those of the better-paid employee.[234] For disparate promotion, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified and applied for the position; (3) the employer rejected him for the job despite his qualifications; and (4) a similarly situated applicant outside the protected class was promoted.[235]

Courts look to various factors to determine whether a comparator is similarly situated to the plaintiff, such as: (1) job responsibility; (2) experience; (3) qualifications; and (4) shared decision-makers.[236] A plaintiff's comparator allegations receive less scrutiny at the motion to dismiss stage than they would at later stages of the lawsuit.[237]

### C.     Plaintiffs do Not Allege Key Details for Their Pay-Based Claims; the Fifth Circuit has Dismissed Similarly Vague Claims.

Plaintiffs' disparate pay allegations are vague. For instance, they do not allege who their comparators are, what their comparators' experience and qualifications are, or what the comparators were paid. And what little information Plaintiffs provide is undermined by the documents incorporated into their amended complaint.

For example, Plaintiffs claim they have better publication records than their comparators. But their 2018 report shows that Plaintiffs' publication records are already factored into their yearly earnings through the History Department race-neutral

---

[234] *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522–23 (5th Cir. 2008).
[235] *Chhim*, 836 F.3d at 470.
[236] *Saketkoo v. Admin'rs of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).
[237] *See Cicalese*, 924 F.3d at 767.

process. The Fifth Circuit has found vague allegations akin to Plaintiffs' insufficient to survive a Rule 12(b)(6) motion. Two cases stand out.

For example, in *Chhim v. Univ. of Tex. at Austin*, the plaintiff claimed unlawful discrimination on grounds that UT Austin "hired a less qualified, similarly situated applicant over Chhim."[238] The Fifth Circuit affirmed the dismissal of the plaintiff's claims. The Court reasoned that the plaintiff pled "no facts that suggest the applicant hired by the University was less qualified than Chhim or was similarly situated."[239] The Court did not credit the plaintiff's claim that "he possessed more relevant experience than the applicant chosen" as this was "based on the implicit assumption that the other applicant *only* had custodial experience with the University, and no relevant supervisory experience or superior writing and communication skills."[240]

In *Angus v. Mayorkas*, the Fifth Circuit found that the plaintiff did not plead a plausible sex discrimination claim as "she failed to allege that comparators outside her protected class were treated more favorably in the selection process."[241] While the plaintiff had alleged "that the selected candidates were outside of her protected class," the Court found her pleadings deficient as she did not "allege any other facts as to the candidate's experience, qualifications, or other relevant attributes."[242]

---

[238] 836 F.3d at 470–71.
[239] *Id.* at 471.
[240] *Id.*
[241] No. 22-50600, 2023 WL 3918986, at *6–7 (5th Cir. June 9, 2023).
[242] *Id.* at *7.

The *Angus* plaintiff also cited "reports indicating that women are underrepresented compared to men" at her workplace.[243] The Court found this insufficient to establish a plausible claim: "[T]he existence of a gender gap in employment at the agency does not suffice to show that a given employment decision was motivated by discriminatory animus."[244]

There are a few relevant takeaways from *Chhim* and *Angus*. To begin, merely calling another employee "similarly situated" or stating that the plaintiff is "more qualified" than the alleged comparator is not enough to establish a plausible discrimination claim.[245] Further, allegations of a racial gap at the workplace "[do] not suffice to show that a given employment decision was motivated by discriminatory animus."[246] Moreover, a plaintiff's discrimination claim is more likely to be inadequately pled when it lacks clarifying information such as: (1) who the comparators are; (2) who discriminated against them; (3) the dates the discrimination occurred; and (4) the comparators' experience, qualifications, or other relevant attributes.[247]

Plaintiffs' disparate pay claims are inadequately pleaded under these principles. There are six reasons why.

First, Plaintiffs do not allege (1) what pay decisions they are challenging; (2) who,

---

[243] *Id.* at *7 n.15.

[244] *Id.*

[245] *See Angus*, 2023 WL 3918986, at *6–7; *Chhim*, 836 F.3d at 470–71.

[246] *Angus*, 2023 WL 3918986, at *7 n.15; *Taylor*, 554 F.3d at 523 ("[A]n individual plaintiff pursuing an *individual* claim may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct, such as general statistical evidence.").

[247] *See Angus*, 2023 WL 3918986, at *6–7.

specifically, made these decisions; (3) what Plaintiffs were paid; (4) what Plaintiffs believe they should have been paid; (5) who their comparators are; (6) what the comparators' experience and qualifications are; and (7) what the comparators were paid.[248] The lack of key details such as these undercuts the plausibility of Plaintiffs' disparate treatment claim.

Second, Plaintiffs' allegations that they "ha[ve] more publications/a better publication record" than their comparators[249] do not support their disparate pay claims. Plaintiffs' publication records are already factored into their yearly earnings because the History Department awards professors preset raises based on the number and type of their publications.[250] Plaintiffs do not dispute that they received the same preset raises for their scholarship as their non-Hispanic peers.

Third, Plaintiffs allege they are underpaid despite having "taught more courses" than their comparators.[251] Yet qualifications are pertinent to a similarly-situated analysis only if "an objectively reasonable decision[-]maker would have found [them] relevant

---

[248] Martinez's comparator allegations are as follows:

> [D]uring the actionable period in this lawsuit as well as for years before, UT has paid Martinez significantly less than comparable, similarly situated non-Hispanic fellow History Department full Professors under the same decision-makers. Examples include UT paying a higher salary to at least three specific, identified peers, even though Martinez has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor."

ROA.466, ¶ 114. Zamora's comparator allegations are nearly identical to Martinez's. ROA.466, ¶ 116.
[249] ROA.466, ¶¶ 114, 116.
[250] ROA.1136.
[251] ROA.466, ¶¶ 114, 116.

in making the challenged decision."[252] And UT Austin's policies confirm that the focus is on student assessments of a professor, not the number of classes taught.[253] Put differently, UT Austin emphasizes quality, not quantity. Plaintiffs do not allege they received better student evaluations than their comparators.

Moreover, teaching more classes is not an indicator of high performance. Faculty in the College of Liberal Arts "who are research-intensive generally carry a 2-2 teaching load (equivalent to a minimum average of 6 contact hours per semester and a maximum average of 9 contact hours per semester)." Those "*who do not meet department expectations* for research-intensive and who do not hold a service-intensive position *are expected to adjust their workload duties*."[254] This includes carrying an "*[i]ncreased teaching load* of 3-3 (equivalent to a minimum average of 9 contact hours per semester and a maximum average of 12 contact hours per semester)."[255]

Fourth, Plaintiffs allege they have "more time in rank as . . . full Professor[s]" than their comparators.[256] This undercuts the notion that Plaintiffs were paid less than the comparators due to their race or national origin because Plaintiffs have attributed this to the "pay compression" issue. Plaintiffs admitted in their 2018 report that pay

[252] *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 233–34 (5th Cir. 2012) (quotations and ellipses omitted).
[253] *See* ROA.1165; ROA.1176, § 3(d).
[254] *Tenured and Tenured Track Faculty Workload Policy*, COLLEGE OF LIBERAL ARTS, https://utexas.app.box.com/s/ndjdkxsxat84k5bka6jge41e9yrarykz (last visited June 12, 2025) (emphasis added).
[255] *Id.* (emphasis added).
[256] ROA.466, ¶¶ 114, 116.

45

compression is one of the main causes of salary inequities and acknowledged that it impacts minorities and non-minorities alike.[257]

The Sixth Circuit recently analyzed the "pay compression" issue (also called "salary inversion") and found that "Title VII is not the proper forum to address this known phenomenon."[258] This makes sense as pay compression arises from non-discriminatory market forces.

At most, Plaintiffs' length-of-service allegations indicate they are underpaid due to race-neutral market forces, not intentional discrimination. This is insufficient to create a plausible disparate treatment claim: "A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and 'obvious alternative explanation.'"[259]

Fifth, Plaintiffs acknowledged in their 2018 report that History Department professors have significant control over their salaries: "To some extent salaries *are within each person's control* inasmuch as gaining raises is a matter of 'playing the game.' (E.g., publishing, getting salary supplements from other units at UT, getting outside job offers, advocating for oneself, getting certain admin jobs, etc.)."[260] It is hard to see how Plaintiffs can plausibly assert that their salaries are largely within their control while also

---

[257] ROA.1132–33, 1150; *see also* ROA.949.
[258] *Zandvakili v. Univ. of Cincinnati*, No. 23-3396, 2024 WL 278548, at *8 (6th Cir. Jan. 25, 2024).
[259] *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 Fed. App'x. 892, 897 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 682).
[260] ROA.1136 (emphasis added).

being attributable to unpreventable discrimination.

Finally, Plaintiffs do not plausibly allege that Hartzell was personally involved in the pay decisions at issue here, as needed to hold him individually liable.[261] HOP 2-2160 shows that the President is involved in pay decisions only after a recommendation concerning a faculty member's "salary rate[]" is "forwarded" to him.[262] Yet Plaintiffs do not claim that their supervisors sent Hartzell any salary recommendations about them.

### D. Plaintiffs' Disparate Endowment and Promotion Claims Fail for Similar Reasons as Their Disparate Pay Claims.

*Zamora's Endowment Claim:* Zamora admits he received an "Endowed Chair position in 2022," but he believes he should have gotten this honor earlier.[263] His claim is conclusory and inadequately pled. Notably, he does not allege key facts such as: (1) what endowment he believes he should have received; (2) who the decision-makers were; (3) why he believes these decision-makers harbored animus towards Hispanics; (4) who received the other endowments in question; and (5) what the recipient's qualifications were.

Zamora contends he was more qualified than the unspecified recipients of the unidentified endowments due to the volume of his publication record, the number of courses he taught, and his time of service as a professor.[264] Yet, he does not show that

---

[261] *See Thompson*, 709 F.2d at 382.
[262] ROA.1166.
[263] *See* ROA.472, ¶¶ 152–54. Martinez did not allege an endowment-based claim.
[264] ROA.466, ¶ 116; ROA.472, ¶ 154.

these are, or reasonably should be, factors for receiving an endowment.

*Plaintiffs' Promotion Claims:* To establish disparate promotions, the plaintiff generally must have "applied for . . . a position for which applicants were being sought."[265] Zamora's promotion-based claim fails under this principle. Plaintiffs allege that the History Department created a procedure in 2019 that enabled professors to apply for certain leadership positions.[266] Zamora does not allege that he applied under this process, or that he wanted to apply but was otherwise deterred from doing so.[267]

Martinez, in contrast, applied to a few open positions between 2019–23,[268] yet his disparate promotion claim is still inadequately pleaded. Notably, he does not allege: (1) who the decision-makers were; (2) why he believes they harbored discriminatory animus against Hispanics; or (3) any meaningful facts about the other selected candidates' experience, qualifications, or other relevant attributes.

Martinez rests his promotions claim on the same flawed comparator allegations as his pay-based claims.[269] Martinez never answers obvious questions like: Why does a professor's ability to crank out written scholarship make him more equipped to handle the day-to-day *managerial* burdens inherent to being a Department Chair? Martinez may want his publication volume, class load, and hiring date to weigh in his favor, but he

---

[265] *See Jenkins v. La. Workforce Comm'n*, 713 F. App'x 242, 245 (5th Cir. 2017).
[266] ROA.468, ¶¶ 124–26.
[267] *See* ROA.468–72, ¶¶ 124–51.
[268] ROA.468–72, ¶¶ 124–51.
[269] *See* ROA.469, ¶ 136; ROA.470–71, ¶ 143; *see also supra*, 41–47.

alleges no facts showing that the History Department ever considered these as relevant factors when filling open leadership positions.

Further, Martinez alleges that the History Department violated its procedures for promoting faculty members.[270] But this is not circumstantial evidence of discriminatory intent because "[a] defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees . . . ."[271] This is because "Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact."[272] Thus, a departure from procedure "make[s] animus plausible" only "where the context suggests the decision-makers were willing to deviate from established procedures in order to accomplish a discriminatory goal."[273]

Plaintiffs do not plausibly allege that the History Department declined to follow its application procedures to discriminate against Hispanics. Indeed, each cited instance of "departure" impacted *every* person interested in the open position, not just Hispanic faculty.[274] The Fifth Circuit has refused to find discriminatory animus when the defendant applied the same procedures to minorities and non-minorities alike.[275]

---

[270] *See* ROA.468–72, ¶¶ 124–51.
[271] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) (quotations omitted).
[272] *Id.* (quotations omitted).
[273] *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1035 (5th Cir. 2022) (quotations omitted).
[274] *See* ROA.468–72, ¶¶ 124–51.
[275] *Turner*, 476 F.3d at 346 (finding no discriminatory intent when the plaintiff "introduced no evidence suggesting that RHA adhered to its disciplinary policies differently in cases involving non-minority employees").

Also, Martinez admits the History Department rarely, if ever, adhered to the promotion procedures it created in 2019. He cites only four open positions within the History Department between 2019–23. And he claims that, in *every* instance, the History Department did not follow its application procedures.[276]

A procedural departure is hardly evidence of discriminatory intent when it is the norm and applied to all employees equally, rather than an unusual deviation aimed at only the plaintiff. In any case, Plaintiffs allege no facts showing that Hartzell was personally involved in any of the endowment or promotion decisions in question.[277] Thus, he cannot be individually liable for these claims.[278]

## III. The Trial Court Correctly Dismissed Plaintiffs' Title VII Retaliation Claims, and It Should have also Dismissed Their § 1981 Retaliation Claims.

The trial court dismissed Plaintiffs' Title VII retaliation claim. The court rightly found causation lacking due to the significant temporal gap between Plaintiffs' first discrimination complaint and the alleged adverse acts.[279] This finding should have also applied to Plaintiffs' § 1981 retaliation claims, which are governed by "identical" elements as their Title VII retaliation claims.[280] Yet due to an apparent oversight, the court allowed Plaintiffs' § 1981 retaliation claims to go to discovery.[281]

---

[276] *See* ROA.468–72, ¶¶ 124–51.
[277] *See* ROA.466–73, ¶¶ 112–57.
[278] *See Thompson*, 709 F.2d at 382.
[279] ROA.1512–15.
[280] *See Pratt*, 247 F.3d at 606 n.1; *Lawrence*, 163 F.3d at 311.
[281] *See* ROA.1519–20, 1524.

Also, the Fifth Circuit and other courts have found that a plaintiff generally cannot show causation when the alleged adverse acts occurred both before and after the plaintiff's protected activity.[282] Here, Plaintiffs allege they received inequitable pay, promotions, and endowments both before and after they complained about discrimination.[283]

Further, Plaintiffs do not plausibly allege that Hartzell was personally involved in the alleged retaliatory acts. For instance, Martinez asserts that he was not promoted to the History Department Chair or Associate Chair positions in retaliation for his discrimination complaints.[284] But Plaintiffs allege no facts plausibly showing that Hartzell was involved in these decisions. Nor do Plaintiffs contend they were ever formally recommended for any promotions, as needed to prompt Hartzell's review under HOP 2-2160.[285]

## IV.   Plaintiffs do Not Plead § 1981 Disparate Impact Claims, and such a Claim is Foreclosed by Prior Fifth Circuit Precedent.

The trial court recognized § 1981 disparate impact claims for Plaintiffs.[286] But Plaintiffs do not allege § 1981 disparate impact claims.[287] Also, the Fifth Circuit has recognized that "Plaintiffs are required . . . under section 1981, to demonstrate

---

[282] *See, e.g., Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 390 (5th Cir. 2017).

[283] *See, e.g.*, ROA.466, ¶¶ 114, 116; ROA.472, ¶ 152; ROA.475, ¶ 168; ROA.483, ¶ 208; ROA.495.

[284] ROA.488, ¶ 241; ROA.468–51, ¶¶ 124–51 (stating that either "UT" or the "History Department" failed to promote Plaintiffs, with no mention of Hartzell).

[285] *See* ROA.1166 (stating that UT Austin's president will review "recommendations" regarding promotion decisions that are "forwarded" to him for final evaluation).

[286] *See* ROA.1519–20.

[287] *See* ROA.486–87, ¶¶ 226–35.

intentional discrimination; mere disparate impact will not suffice."[288] Thus, disparate impact claims are not viable under § 1981.[289]

## V.  Plaintiffs' Title VII Disparate Treatment Claims Fail for Largely the Same Reasons as Their § 1981 Disparate Treatment Claims.

Identical elements govern Title VII and § 1981 claims in the employment discrimination and retaliation context.[290] Thus, Plaintiffs' Title VII disparate treatment claims against UT Austin are inadequately pled for effectively the same reasons as their § 1981 disparate treatment claims against Hartzell.[291]

CONCLUSION

This Court should reverse the district court's denial of Defendants' motion to dismiss as to Plaintiffs' § 1981 and Title VII disparate treatment claims.

Date: July 28, 2025                    Respectfully Submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

---

[288] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 715 (5th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229, 239–40 (1976)).
[289] *See, e.g., Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the United States & Canada, AFL-CIO, Local 198*, 495 F. Supp. 3d 392, 397 (M.D. La. 2020); *Collins-Pearcy v. Mediterranean Shipping Co. (USA) Inc.*, 698 F. Supp. 2d 730, 741 (S.D. Tex. 2010).
[290] *Pratt*, 247 F.3d at 606 n.1; *Lawrence*, 163 F.3d at 311.
[291] *Supra*, 38–52.

52

KIMBERLY GDULA
Chief, General Litigation Division

*/s/ Todd Dickerson*
TODD A. DICKERSON
Attorney-in-Charge
Texas Bar No. 24118368
Todd.Dickerson@oag.texas.gov
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548-Capitol Station
Austin, Texas 78711-2548
Tel.: (737) 228-7289
Fax: (512) 320-0667
COUNSEL FOR DEFENDANTS-APPELLANTS

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13: (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document is protected by OAG's CrowdStrike agent and is free of viruses.

*/s/ Todd Dickerson*

**CERTIFICATE OF COMPLIANCE**

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,974 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Garamond, with 12-point for footnotes) using Microsoft Word (the same program used to calculate the word count).

*/s/ Todd Dickerson*