**No. 25-50181**

**In the United States Court of Appeals**
**for the Fifth Circuit**

---

ALBERTO MARTINEZ, EMILIO ZAMORA
*Plaintiffs-Appellees*,

*v.*

UNIVERSITY OF TEXAS AT AUSTIN, JAY HARTZELL, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

# APPELLEES' BRIEF

Robert Notzon
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
(512) 852-4788 facsimile

Lead Counsel for Plaintiffs-Appellees

Robert W. Schmidt
Robert W. Schmidt Law Firm, PLLC
1502 West Avenue
Austin, Texas 78701
(512) 484-2276
(512) 537-0708 facsimile

Co-Counsel for Plaintiffs-Appellees

## CERTIFICATE OF INTERESTED PARTIES

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

| Plaintiffs – Appellees | Plaintiffs – Appellees' Counsel |
|---|---|
| Alberto Martinez<br>Emilio Zamora | Robert S. Notzon<br>LAW OFFICE OF ROBERT S. NOTZON<br><br>Robert W. Schmidt<br>ROBERT W. SCHMIDT LAW FIRM PLLC |

| Defendants – Appellants | Defendants – Appellees' Counsel |
|---|---|
| Jay Hartzell<br>University of Texas at Austin | Office of the Attorney General of Texas<br>Ken Paxton<br>Brent Webster<br>Ralph Molina<br>Austin Kinghorn<br>Kimberly Gdula<br>Todd Dickerson (lead trial and appellate counsel) |

*/s/ Robert S. Notzon*
Robert S. Notzon

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that oral argument is not necessary to resolve this appeal. However, should this honorable Court prefer oral argument regarding this matter, Plaintiffs will gladly participate.

**CERTIFICATE OF INTERESTED PARTIES ---------------------------- II**

**STATEMENT REGARDING ORAL ARGUMENT ---------------------III**

**STATEMENT OF JURISDICTION ------------------------------------------ 1**

**STANDARD OF REVIEW---------------------------------------------------- 2**

**STATEMENT OF ISSUES -------------------------------------------------- 6**

**STATEMENT OF CASE ---------------------------------------------------- 7**

**SUMMARY OF ARGUMENT ------------------------------------------- 15**

**ARGUMENTS------------------------------------------------------------------ 16**

I. DEFENDANT UT IS NOT ENTITLED TO AN INTERLOCUTORY APPEAL REGARDING PLAINTIFFS' TITLE VII CLAIMS............................................16

II. DEFENDANT HARTZELL DID NOT MOVE TO DISMISS PLAINTIFFS' EQUAL PROTECTION CLAIMS AND THEY ARE NOT BEFORE THIS COURT.20

III. HARTZELL HAS WAIVED ARGUMENTS THAT PLAINTIFFS DID NOT SHOW "DELIBERATE INDIFFERENCE" OR "RATIFICATION."......................21

IV. QUALIFIED IMMUNITY STANDARDS.............................................22

V. PLAINTIFFS MEET THE QUALIFIED IMMUNITY TEST: IT IS CLEARLY ESTABLISHED LAW THAT A PUBLIC EMPLOYEE MAY NOT DISCRIMINATE ON THE BASIS OF RACE AND RACE DISCRIMINATION IS NEVER "REASONABLE."...........................................................................23

VI. PLAINTIFFS COMPLAINT EASILY MEETS THE PLEADING STANDARDS FOR RACE DISCRIMINATION.....................................................................25

A. The Supreme Court And Fifth Circuit Have Emphasized That A Court Errs By Requiring Detailed Pleadings Of A Prima Facie Case.---------------------------------------------------------------------- 25

B. Plaintiffs' Plead Ample Facts That Hartzell Was Personally Involved In The Discriminatory Actions At Issue. -------------------- 28

C. Hartzell Intentionally Refuses To Consider, Investigate Or Act On Concerns Of Discrimination Raised By Hispanic Faculty. ----- 31

D. Plaintiffs More Than Sufficiently Plead Hartzell's Personal Involvement With Discrimination and Retaliation Towards Plaintiffs. ---------------------------------------------------------------------- 34

E. Plaintiffs Have Fully Established Disparate Treatment Regarding Pay And Defendants' Cited Cases Are Easily Distinguishable. ---------------------------------------------------------------- 37
F. Plaintiffs Have Pled Facts Establishing UT's Disparate Treatment of Hispanics In Promotions. ----------------------------------- 44
G. The Law Was Clearly Established That A Public Employee Can Be Held Liable For Race Discrimination and Retaliation Under §1981 If They Are Personally Involved. ----------------------------------- 47
H. The Hispanic Equity Report Does Not Preclude Plaintiff's Claims of Intentional Discrimination Against Hartzell. ------------- 54
I. The District Court Properly Analyzed and Denied Hartzell's Motion to Dismiss Plaintiffs' §1983 Retaliation Claims Against Hartzell------------------------------------------------------------------------ 58

**CONCLUSION------------------------------------------------------------------ 61**

**CERTIFICATE OF COMPLIANCE------------------------------------------ 62**

**CERTIFICATE OF SERVICE-------------------------------------------------- 63**

## CASES

*Angus v. Mayorkas*, No. 22-50600, 2023 U.S. App. LEXIS 14506, at *15 (5th Cir. 2023) ---------- 38
*Armstrong v. Ashley*, 918 F.3d 419, 422 (5th Cir. 2019) ---------- 1
*Ashcroft v. Iqbal*, 556 U.S. 662, 673-74 (2009) ----------2, 3
*Automotive Workers v. Johnson Controls, Inc.*, 499 U. S. 187, 199 (1991) ---------- 57
*Babb v. Wilkie*, 589 U. S. 399, 405 (2020) ---------- 57
*Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007) ---------- 3
*Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997)---------- 48, 53
*Belton v. Geo Grp., Inc.*, No. 21-30144, 2021 U.S. App. LEXIS 36150, at *8 (5th Cir. 2021) ---------- 39
*Benfield v. Magee,* 945 F.3d 333, 336 (5th Cir. 2019)---------- 3
*Bevill v. Fletcher*, 26 F.4th 270, 274 (5th Cir. 2022) ---------- 1, 22
*Blackwell v. Laque*, 275 F. App'x 363, 367 (5th Cir. 2008)---------- 24
*Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440-41 (5th Cir. 2015) ---------- 5
*Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) ---------- 28, 57
*Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)---------- 20, 22
*Burton v. Freescale Semiconductor, Inc.,* 798 F.3d 222, 236, 239 (5th Cir. 2015) ---------- 46
*Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016) --- 27
*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) ---------- 27, 50
*Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 193-94 (5th Cir. 2009) -- 1, 22
*Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533-35 (5th Cir. 1997) ---------- 21
*Conley* v. *Gibson,* 355 U.S. 41, 47-48 (1957)---------- 26
*Faraca v. Clements,* 506 F.2d 956 (5th Cir. 1975), *cert. denied*, 422 U.S. 1006 (1975) ----------passim
*Felton v. Polles*, 315 F.3d 470, 479, 482-83 (5th Cir. 2002) ------ 21, 51, 53
*Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 339 (5th Cir. 2003) ---- passim
*Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ---------- 4
Garcia v. Orta, 47 F.4th 343, 349 (5th Cir. 2022) ---------- 22
*Hannah v. United States*, 523 F.3d 597, 600 (5th Cir. 2008)---------- 23, 25
*Harris v. City of Balch Springs*, 9 F. Supp. 3d 690, 692-93 (N.D. Tex. 2014) ---------- 52
*Harris v. Clay County*, 47 F.4th 271, 276 (5th Cir. 2022) ---------- 18

*Holden v. Knight*, 155 F. App'x 735, 737 (5th Cir. 2005) ------------------- 21
*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) ----- 30
*Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701 (1989) --------------------- 51, 53
*Johnson v. Bowe*, 856 F. App'x 487, 491 n.5 (5th Cir. 2021) -------------- 18
*Leal v. McHugh*, 731 F.3d 405, 415 (5th Cir. 2013) -------------------------- 28
*LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) -------------------------------------------------------------------- 22
*Lynch v. Cannatella*, 810 F.2d 1363, 1371 (5th Cir. 1987)---------------- 17
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973) -- 26, 27, 30
*Miller v. Raytheon Co.*, 716 F.3d 138, 145 (5th Cir. 2013) ----------------- 30
*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)--------------------------- 51
*Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009) ------------- 37, 45
*Murray v. UBS Sec., LLC,* 144 S. Ct. 445, 453 (2024)----------------------- 57
*Oden v. Oktibbeha Cty.*, 246 F.3d 458 (5th Cir. 2001)------------ 51, 52, 53
*Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576-77 (5th Cir. 2003) 30
*Porter v. Lowndes County, Mississippi,* 406 F. Supp. 2d 708 (N.D. Miss. 2005) ------------------------------------------------------------------------------- 52
*Rogers v. Humphrey Cty.*, No. 4:09-CV-037, 2009 U.S. Dist. LEXIS 103863, at *1 (N.D. Miss. 2009)--------------------------------------------- 52
*Sanders v. Gibson*, No. 23-11196, 2025 U.S. App. LEXIS 8093, at *4-5 (5th Cir. 2025)---------------------------------------------------------------------- 1
*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)--------------------------------- 27
*Seibert v. Jackson Cty.*, No. 1:14-CV-188-KS-MTP, 2015 U.S. Dist. LEXIS 102632, at *19-20 (S.D. Miss. 2015) -------------------------------- 52
*Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 549-50 (5th Cir. 1997) ------------------------------------------------------------------ 21, 23, 24
*Stevenson v. Tocé*, 113 F.4th 494, 501 (5th Cir. 2024)------------------------ 2
*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ----- 26, 27, 42, 50
*Swint v. Chambers County Commission,* 514 U.S. 35, 49-50 (1995) 17, 18
*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)------ 26
*Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) ------------------------ 2
*Uffelman v. Lone Star Steel Co.,* 863 F.2d 404 (5th 1989) ----------------- 30
*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 375 (5th Cir. 2004) ------------------------------------------------------- 2, 3, 5
*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 346 (5th Cir. 2013) ------------------------------------------------------------- 3
*Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 644 (5th Cir. 1992) ----------- 61
*Williams v. City of Yazoo,* 41 F.4th 416, 421 (5th Cir. 2022)------------- 18

*Yul Chu v. Miss. State Univ.*, 592 F. App'x 260, 266-67 (5th Cir. 2014) 21
*Zarnow v. City of Wichita Falls*, 500 F.3d 401, 406 (5th Cir. 2007) 17, 18

## STATUTES

§1983 ---------- 9, 34
42 U.S.C.S. §1981 ---------- 9, 22, 24

## RULES

12(b)(6) ---------- 1, 2, 4, 29
Federal Rule of Civil Procedure 8(a)(2) ---------- 28

## STATEMENT OF JURISDICTION

This Court does not have jurisdiction over the interlocutory appeal of Appellant/Defendant the University of Texas at Austin concerning Plaintiffs' Title VII claims and the district court's ruling denying UT's Rule 12(b)(6) Motion to Dismiss those claims. (See Section I *infra.*)

This Court has appellate jurisdiction to review the district court's order denying the motion to dismiss on the basis of qualified immunity "only to the extent that the appeal concerns the purely legal question [of] whether the defendants are entitled to qualified immunity on the facts[.]" *Bevill v. Fletcher*, 26 F.4th 270, 274 (5th Cir. 2022) (citing *Armstrong v. Ashley*, 918 F.3d 419, 422 (5th Cir. 2019)). "Our jurisdiction, however, is severely curtailed: we are restricted to determinations of question[s] of law and legal issues, and we do not consider the correctness of the plaintiff's version of the facts." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 193-94 (5th Cir. 2009) (internal quotation marks and citations omitted), *see also Sanders v. Gibson*, No. 23-11196, 2025 U.S. App. LEXIS 8093, at *4-5 (5th Cir. 2025). "In other words, a proper appeal asks [the court] whether the district court erred in concluding as a matter of law that officials are not entitled to [qualified immunity] on a given set of facts.'"

*Stevenson v. Tocé*, 113 F.4th 494, 501 (5th Cir. 2024) (internal quotation marks and citations omitted). The court also has jurisdiction to review the sufficiency of a complaint on interlocutory appeal when that issue is inextricably intertwined with the denial of qualified immunity. *Bevill*, 26 F.4th at 274 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 673-74 (2009)). But that is not in play here.

## STANDARD OF REVIEW

### A. Complaints Must Be Liberally Construed, Well-Pled Facts Accepted As True, All Inferences Drawn In Plaintiffs' Favor And The Court Must Not Consider The Merits Of The Claims.

This court reviews de novo a district court's ruling on a motion to dismiss under F.R.C.P.12(b)(6). *Ferrer & Poirot, GP v. Cincinnati Ins. Co.*, 36 F.4th 656, 658 (5th Cir. 2022). "A motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). A complaint should be dismissed for failure to state a claim "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 375 (5th Cir. 2004). The complaint must be liberally construed in favor of the plaintiff, all well-pleaded facts accepted as true and viewed

in the light most favorable to the plaintiff. *Id., United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 346 (5th Cir. 2013). The court should draw "all reasonable inferences in the nonmoving party's favor." *Benfield v. Magee,* 945 F.3d 333, 336 (5th Cir. 2019). The court should not evaluate the claims based on their merits, even if "it seems almost a certainty to the court that the facts alleged cannot be proved to support the legal claim." *United States ex rel. Riley*, 355 F.3d 370

To defeat a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, a court reviewing a complaint "[is] not bound to accept as true a legal conclusion couched as a factual allegation . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678-79.

The court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6)

motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a Court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)).

### B. Defendants Improperly Raise And Rely On Factual Disputes Based On Mischaracterized Information Taken Out of Context From Documents Referenced In Plaintiffs' Complaint.

Throughout Appellant's Brief, Defendants raises "fact" based arguments to dispute the merits of Plaintiffs' claims.[1] Because the Court is considering a Rule 12(b)(6) motion (as opposed to a motion for summary judgment), the court should not evaluate the merits of Plaintiffs' allegations or consider disputed issues of fact. *See United States ex rel.*

[1] Some of these "fact" based arguments were raised before the district court, others were not. To some extent, Defendants appear to be attempting to file a new motion to dismiss with this appellate Court, which of course is not appropriate. For example, in Appellants' Brief at pages 7-8, Defendants for the first time raise new fact-based arguments and cite to new "evidence" from exhibits not previously raised before the district court. This includes claims about amounts of money allocated to the History Department in 2018 for raises and amounts of "Faculty Investment Initiative" raises that were awarded to "minority faculty members" claiming these raises for Hispanics "far outstripped their representation in UT's workforce." Defendants also cite for the first time "evidence" concerning "service raises." It appears Defendants offer this new "evidence" to generally support newly raised legal arguments (not presented to the District Court concerning "deliberate indifference" and generally suggesting that Plaintiffs could not have been discriminated against because UT has been generous to minorities. Because these arguments and supporting factual "evidence" were not raised before the district court, they are waived. *Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021) ("Arguments not raised before the district court are waived and cannot be raised for the first time on appeal.") Additionally, as discussed *infra*, Defendants also raise new legal arguments in this appeal which this Court should not consider.

*Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

Defendants' factual disputes and arguments come primarily from documents that were referenced in Plaintiffs' complaint and attached as exhibits to Defendants' motion to dismiss. This court has held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015). While some of those exhibits have no relevance to this case, Plaintiffs acknowledge that some play a role like providing evidence of a protected activities and disparate experiences of Hispanic faculty, but they are not "central" to Plaintiffs' claims.

Nonetheless, Defendants cannot properly support a motion to dismiss at the pleading stage based on cherry-picked quotes from various documents raised for essentially fact-based "impeachment" or "rebuttal" purposes to dispute Plaintiffs' claims. Moreover, Defendants repeatedly mischaracterize information and take it out of context. This is not appropriate for a motion to dismiss. In *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440-41 (5th Cir. 2015), the plaintiff in his

complaint referred to certain statements in affidavits made by law enforcement agents relating to his claims. The defendant then relied on *other* statements in the agents' affidavits not mentioned by plaintiff in his complaint to contradict or counter the plaintiff's claims. The court held that the statements in the affidavits "should not control to the extent that they conflict with [the plaintiff's] allegations. . . . Accepting the Defendant-agent's unilateral statements as true would deprive [the plaintiff] of the presumption of truth to which he is entitled at this stage of the litigation."[2]

## STATEMENT OF ISSUES

1. Can a governmental body which is not entitled to qualified immunity file an interlocutory appeal on legal claims not subject to qualified immunity or interlocutory appeal?
2. Generally, arguments not raised before the district court are waived and will not be considered on appeal. Can Hartzell for the first time on an interlocutory appeal raise new legal arguments and cite to new "factual" evidence to support his arguments?

[2] To the extent Defendants contend there is factual "evidence" that rebuts Plaintiffs' claims, they may raise this evidence at summary judgment or cross-exam Plaintiffs at the appropriate time.

3. Plaintiffs allege race discrimination and retaliation under §1981 through §1983. Is it clearly established law that a public employee cannot racially discriminate or retaliate for complaints of race discrimination against other employees? Is it clearly established that such employees may seek recovery under these statutes?
4. Have the Plaintiffs adequately pled claims of race discrimination and retaliation against Hartzell?

## STATEMENT OF CASE

Texas' flagship state university, UT, publicly acknowledged that its Hispanic faculty are paid significantly less than similarly situated White faculty and face other disparities as well. Plaintiffs are accomplished full Professors at UT. Together with other Hispanic Professors, Plaintiffs professionally and thoughtfully raised concerns of discrimination with UT. When their efforts failed, they were forced to file this lawsuit against UT and its former president Jay Hartzell.

After extensive briefing and oral argument, Senior District Court Judge David Ezra correctly denied Defendants' motion to dismiss Plaintiffs' race discrimination and retaliation claims under 42 USC §1981 and §1983, including denying Hartzell qualified immunity.

Prof. Martinez, Hispanic of Puerto Rican origin, and Prof. Zamora, Hispanic of Mexican origin, allege violations of 42 U.S.C.S. §1981, §1983, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution against Hartzell, in his individual capacity, for unlawful

national origin/Hispanic discriminatory employment practices including disparate treatment and retaliation.[3] These claims are based on Hartzell's intentional actions and inactions constituting intentional discrimination and retaliation towards Plaintiffs in pay, promotions, endowments, and appointments to compensated leadership positions. ROA.448¶2, ROA.486-488¶¶226-243

Prof. Martinez (Plaintiff) has been a Professor (otherwise known as "full Professor," which is the highest tenure ranking at UT) since 2015. ROA.452(¶27) During Martinez's time working at UT, he has been recognized as an outstanding professor and scholar with an impressive list of accomplishments, partially including:

- published seven scholarly books with some of the top presses in the country: Princeton and Johns Hopkins, ROA.452¶¶21-26
- garnered highly positive reviews in academic journals and periodicals around the world, including from the United States, Great Britain, Germany, Spain, Italy, China, and Malaysia. *Id.*
- Research fellow at Massachusetts Institute of Technology, Harvard University, California Institute of Technology, Boston University, and the Smithsonian, *Id.*
- Taught 64 courses, which is significantly more that most faculty in the History Department during that same period. *Id.*

Prof. Zamora has been a UT professor since 2000. During Zamora's time working at UT, he has amassed the following impressive measurably objective accomplishments, partially including:

- prepared or collaborated in the production of three single-authored books, a translated and edited WWI diary, a translated

[3] Plaintiffs also allege violations of Title VII of the Civil Rights Act of 1964 for race/national origin discrimination including disparate treatment, disparate impact and retaliation against UT. ROA.452(¶¶20-29) and ROA.453(¶¶30-33).

and edited two-volume work by Alonso S. Perales, three co-edited anthologies, a co-edited eBook, and three Texas history texts, ROA.453¶¶30-32

- received seven book awards, a best-article prize, and a Fulbright García-Robles fellowship with a one-year residency at the University of Guanajuato, Mexico, *Id.*
- received he 2017 Scholar of the year from the National Association for Chicana and Chicano Studies (NACCS), the 2017 NACCS Tejas Foco Premio Estrella de Aztlán Lifetime Achievement Award, the 2019 Ruth A. Allen Pioneer in Texas Working Class History Award from the Texas Center for Working-Class Studies, Collin College, the 2021 Roy Rosenzweig Distinguished Service Award from the Organization of American Historians, and the 2023 William C. Powers Jr. Lifetime Service Award from the University of Texas at Austin, *Id.* and
- lifetime member of the Texas Institute of Letters, a lifetime Fellow with the Texas State Historical Association (TSHA), and a past-President of TSHA in 2019-20, including membership in the organization's Executive Committee. *Id.*

Despite Plaintiff's impressive accomplishments, UT and Hartzell have paid them significantly less compared to objectively less qualified, similarly situated peers who are not Hispanic. UT and Hartzell have also refused to promote them to compensated positions of leadership or recognize their work with endowments, instead favoring less qualified candidates. ROA.472¶155-56, ROA.489¶a

UT's policies require that Hartzell is responsible for reviewing, evaluating, and making the final decision on salary determinations and promotions for UT faculty. Hartzell's discriminatory and retaliatory decisions, actions, and inactions toward Plaintiffs are the subject of this lawsuit. ROA.453-455¶¶35-42,47-48,52

In the past (before Hartzell was president), UT had been presented with evidence of disparities experienced by female faculty and black faculty. In response, UT reviewed the evidence, acknowledged the harm, and rectified those disparities. ROA.461¶¶80-81

In 2017 and 2018, Martinez, Zamora and other Hispanic professors began meeting and speaking amongst themselves regarding their shared sense that UT was paying them at a lower rate than fellow non-Hispanic faculty with comparable lengths of service, records of scholarship, teaching, and service. ROA.453¶34 Prof. Martinez, Prof. Zamora, and other faculty members raised these concerns to UT officials and were met with hostile and defensive responses from some of UT's management officials. ROA.457-458¶60

The goal of Martinez, Zamora and the other Hispanic professors (who were unrepresented by legal counsel) was to obtain equity in their employment situation just as the female and black faculty had achieved by working with UT's administration in a collegial and professional manner.

UT's Vice Provost Gordon provided the group with charts during the Summer of 2018 confirming that Hispanic faculty had pay disparities in the Liberal Arts College and throughout the university even though the Hispanic faculty members, contrary to their objective achievements and merits. ROA.458¶63

The Hispanic professors' concerns were referred to a university committee, but no progress was made. ROA.458¶¶63-67 Plaintiffs and the other professors then worked independently for months reviewing salary and performance information concerning Hispanic faculty and

prepared the Hispanic Equity Report ("HER") completed on or about October 8, 2019. ROA.459¶67 The HER contained substantial examples of discriminatory disparities to the detriment of the Hispanic faculty due to their national origin/race in comparison to non-Hispanic faculty. ROA.459-460¶¶68-78 These examples included the following:

- in 2016-17, each of the 47 fulltime Hispanic full Professors at the University of Texas were paid a mean annual compensation of $25,342 less than the 758 White fulltime full Professors (over 13% deficit), ROA.459¶68
- for 79 consecutive years, UT's Institute of Latin American Studies was only headed by White directors, never by Hispanics or Latin Americans, ROA.459¶71
- In 2019, UT had appointed or promoted 130 persons to university positions of Dean, Vice Dean, Associate Dean, and Assistant Dean, that is, all serving in 2019. Of those, UT had appointed or promoted only 10 Hispanics into those positions, that is only 7.7 % and none were awarded to Hispanic females, in contrast to the fact that nearly 20% of the Texas population were Hispanic females and many of the Hispanic female faculty members within the university were eminently qualified, ROA.459-460¶73
- Of the approximately 250 administrators in the leadership of UT's schools all above the Dept. Chair level, UT had appointed or promoted only 14 Hispanics by 2019, which is only 6% in mostly the lower-level positions, ROA.460¶¶74-75
- No Hispanics were Directors of major independent entities, such as the Museum, Ransom Center, Briscoe Center for American History, Institute of Latin American Studies, Clements Center of National Security, and Center for Sports Leadership, ROA.460¶76
- Although 40% of the population in Texas was Hispanic in 2018, UT had only appointed or promoted 3.3% Hispanics to an endowed Chair or Professorship (i.e., only 18 of the 539 appointments). ROA.460¶¶77-78

¶

UT subsequently provided its own data to Texas State Representative Gina Hinojosa, who represents the district in which UT is located, showing a nine-year-straight 12% average pay disparity for Hispanic Professors compared to non-Hispanic on a campus-wide basis (accounting for field and experience): ROA.460-461¶¶79.

UT initially responded positively to the Hispanic professors and their findings of significant disparities. In November 2019, President Fenves acknowledged at a Faculty Council Meeting that disparities affecting Hispanics existed and that he recognized the need to address such disparities just as UT had done with the female and black faculty. ROA.461(¶82)

A few months later during the next semester, Spring 2020, in response to the concerns raised by the Hispanic professors, UT's Provost McInnis announced the allocation of $3 million for "Equity Raises" for faculty. No other faculty group besides the Hispanic faculty had raised concerns regarding pay equity, so it was reasonable for the Hispanic faculty members advocating for equity in their employment to expect a substantial share of that recently announced $3 million for "Equity Raises." ROA.461-462¶¶83-85

However, in mid-2020 prior to the disbursement of the "Equity Raises" UT's administration changed and Hartzell was appointed president. After Hartzell became Interim President in or around July 2020, Hartzell's Senior Vice Provost disclosed that only approximately 10 percent, or $306,000 of $3 million fund[4] was being allocated for pay raises

[4] ROA.462¶¶84,87.

for the approximately 132[5] Hispanic professors at UT. That is an average of just $2,318 per Hispanic faculty member, far less than the documented pay differences.

Shortly after that announcement, in late July 2020, Hartzell continued to reverse UT's acknowledgment of the Hispanic faculty's disparate treatment. Plaintiff Martinez and UT's Faculty Council Executive Committee provided Hartzell with a report that Hispanic-focused academic programs had been cut by (87.5%) or $1.4 million out of a total $1.6 million cuts in 2018. ROA.462-463¶¶89-92 The committee requested that those funds be restored. *Id.* Hartzell refused to restore funding to the Hispanic programs. *Id.*

On August 3, 2020, Plaintiffs and other Hispanic professors as part of another university committee reached out to Hartzell raising the disparities affecting Hispanic faculty and requesting raises in compensation to address the disparities. ROA.463¶¶93-94 Hartzell did not respond. ROA.463¶¶93-94.

When efforts to work with Hartzell and UT regarding the previously acknowledged disparities suffered by Hispanic faculty appeared to fail, several of the Hispanic faculty decided to take their complaints outside of UT and on to federal oversight on this issue by filing a complaint of discrimination with the United States Department of Labor ("DOL"). Plaintiff Martinez filed his charge on October 14, 2020. ROA.463¶95

[5] 47 full Professors, ROA.459¶68; 38 Assistant Professors, ROA.929; 33 Associate Professors, ROA.930.

Around this same time, Interim Provost Jaffe created a new committee called the Equity Review Process Consultative Committee ("ERPCC") whose announced purpose was to be assessing salary equity among professors and to work with an outside contractor hired by Hartzell to analyze salary inequities. ROA.463-464¶¶96-97

No mention was made regarding Hispanic pay disparities as part of the ERPCC's goals or purpose even though that was the only equity issue under discussion and documented with data at that time. ROA.463-464¶¶96

Within the next three months of Martinez's DOL complaint of discrimination and retaliation, between October 2020 and January 2021, eight other Hispanic faculty members also filed complaints of discrimination and retaliation with the DOL. ROA.464¶99

In February 2021, less than four months after the Hispanic professors (including the Plaintiffs) had filed their complaints of discrimination and retaliation, Hartzell responded by unilaterally cancelling the contractor's work and disbanding the ERPCC . ROA.464¶¶99-100

Neither Hartzell nor UT provided any reasons or explanations for why Hartzell abruptly aborted the salary equity review so soon after creating the ERPCC and hiring the contractor, *and* so soon after the nine Hispanic faculty members filed complaints of discrimination and retaliation with the DOL. ROA.464¶101 Moreover, after the nine Hispanic faculty members filed their complaints of discrimination and retaliation, Hartzell and UT did not address or investigate either salary inequities generally or in reference to Hispanic faculty specifically. *Id.*

> This was not the last time that Hartzell refused to acknowledge and address the Hispanic faculty disparities in their employment at UT. During the next year, 2022, Hartzell announced approximately $50 million would be dedicated "to help address some of our most acute challenges through structural adjustments for some of our faculty and staff." ROA.465¶110

However, Hartzell made no mention of Hispanic employees or faculty or the pay disparities that they have been experiencing for years. *Id.* Additionally, Hartzell also did not report back to the faculty or staff to let them know what amount, if any, was ever allocated or paid to faculty or staff. ROA.465-466¶111

Hartzell continued and refused to address UT's history of discrimination towards Hispanic faculty. This included specifically, as set forth infra and in Plaintiffs complaint, discriminatory pay, promotion, and endowment decisions directly with regard to Plaintiffs.

## SUMMARY OF ARGUMENT

This interlocutory appeal regarding the denial of qualified immunity presents relatively simple issues for this Court:

First, UT impermissibly attempts to piggy-back on Hartzell's interlocutory appeal. UT asks this Court to overrule longstanding precedent and create a new type of interlocutory appeal – essentially "pendant party jurisdiction." UT seeks dismissal of Plaintiffs' distinct Title VII disparate treatment claims. However, abundant Fifth Circuit authority restricts this Court's jurisdiction to do so.

Second, Hartzell claims that the law was not "clearly established" that a governmental employee can be held liable for racially discriminating and retaliating against an employee. But of course, all

reasonable governmental employees know race discrimination and retaliation have been illegal for decades. Moreover, in *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 339 (5th Cir. 2003) this Court specifically held that a university employee may be held liable under §1981 for illegal race retaliation if the employee "exercised control over the faculty positions and titles." As President, Hartzell had this control, yet his appeal attempts to muddy those clear waters and create uncertainty where there is none.

Third, Plaintiffs have also plead facts establishing Hartzell's personal involvement and responsibility for the discriminatory (and retaliatory) employment actions, including (but not limited to) the fact that UT's policies (HOP 2-2160) *require* Hartzell to conduct an "*evaluation*" and make the "*decision*" on all faculty salary decisions and promotions. ROA.1166 (emphasis added).

Finally, Plaintiffs have clearly met the Rule 12(b)(6) standards and pled abundant, non-conclusory facts establishing that they were treated differently and worse because of their race and protected activities, including receiving less pay and promotions than similarly situated (and less qualified) peers who are White/not Hispanic.

## ARGUMENTS

### Defendant UT Is Not Entitled To An Interlocutory Appeal Regarding Plaintiffs' Title VII Claims.

Fifth Circuit precedent could not be clearer: While an *individual governmental employee* may file an interlocutory appeal based on qualified immunity, governmental entities do not enjoy qualified

immunity and only officials in their individual capacities may assert qualified immunity. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 406 (5th Cir. 2007); *Lynch v. Cannatella*, 810 F.2d 1363, 1371 (5th Cir. 1987). UT asserts with essentially no briefing that it is entitled to a separate interlocutory appeal of the district court's denial of its motion to dismiss some of Plaintiffs' Title VII claims against the university on the basis of "pendant jurisdiction."

The Supreme Court and Fifth Circuit have strongly cautioned against the kind of pendant party jurisdiction and interlocutory appeal that UT is attempting. In *Swint v. Chambers County Commission,* 514 U.S. 35, 49-50 (1995), a unanimous Supreme Court warned appellate courts to be wary of allowing parties to "parlay . . . collateral orders into multi-issue interlocutory appeal tickets" and found no pendent party jurisdiction of governmental entity claims/defenses in an interlocutory appeal by officers raising qualified immunity. The Fifth Circuit has also repeatedly and clearly held, "[P]endent interlocutory appellate jurisdiction over additional issues is looked on with disfavor, . . . and we have refused to recognize so strange an animal as pendent party interlocutory appellate jurisdiction." *Zarnow*, 500 F.3d at 407 (citations

omitted). As this Court explained in *Williams v. City of Yazoo,* 41 F.4th 416, 421 (5th Cir. 2022), "Many defendants would like to appeal, but only some may. . . Municipalities [similar to governmental entities like UT] do not enjoy qualified immunity. . . Yazoo City argues that we nonetheless can hear its appeal because it is 'inextricably intertwined' with the claims against the individual defendants. But we do not allow municipalities to piggyback on officers' interlocutory qualified immunity appeals." Every Fifth Circuit case to consider the issue has rejected the attempt to take an interlocutory appeal by a party not already entitled to an interlocutory appeal, and of defenses and claims that are not subject to interlocutory appeal.[6]

Moreover, UT's claim is incorrect that Plaintiffs' §1981 claims against Hartzell and Plaintiff's Title VII claims against UT "turn on the

[6] *See e.g. Harris v. Clay County*, 47 F.4th 271, 276 (5th Cir. 2022) (While "[o]ther circuits do sometimes exercise pendent party jurisdiction over orders involving municipalities when individuals with qualified immunity also appeal, . . . we do not"); *Johnson v. Bowe*, 856 F. App'x 487, 491 n.5 (5th Cir. 2021) ("the discretion to exercise pendent interlocutory appellate jurisdiction does not include pendent party interlocutory appellate jurisdiction over parties that the collateral order doctrine does not already bring into the appeal") (*citing Swint*, 514 U.S. at 38 *Zarnow*, 500 F.3d at 407, *McKee*, 877 F.2d at 413,416, CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3937 (3d ed. 2019) (noting that "the Supreme Court has rejected pendent party appeal jurisdiction" in the context of qualified immunity).

same facts."[7] While UT is correct that the elements of liability are generally the same for both §1981 and Title VII claims, the facts supporting Plaintiffs' §1981 claims against Hartzell necessarily focus on Hartzell's actions, inactions and responsibilities. However, Plaintiffs' Title VII claims are broader and, as Defendants note, include liability based on the actions of others besides Hartzell, such as Deans, Department Chairs and others.[8] Plaintiffs' Title VII claims also cover periods of time before Hartzell was president and therefore, Hartzell and UT have distinct, and not inextricably intertwined, issues of liability.[9] Thus, assuming arguendo Defendant Hartzell is entitled to qualified immunity and is therefore not liable in this matter, that determination simply does not equate to "no Title VII liability" for UT.

Additionally, while the specific elements or manner of evaluating Title VII and §1981 claims may be the same, as Defendants acknowledge,

---

[7] Appellants' Brief at 2.

[8] *See* Appellants' Brief at 11.

[9] *See* ROA 450-51¶¶13-14 and 462¶87. Plaintiffs' charges of discrimination were filed October 14, 2020 (Martinez) and January 7, 2021 (Zamora) and cover a period reaching back 300 days to December 19, 2019 and March 13, 2020 respectively. Hartzell became president of UT in or about July 2020. Thus, both Zamora and Martinez's Title VII discrimination claims reach back farther and cover a period when Hartzell was not president, making a "pendent party" review of Title VII claims against UT distinct and not "inextricably intertwined" and requiring evaluation of time periods and events not part of the specific qualified immunity claims of Hartzell.

the primary tests for determining qualified immunity appeals is whether the constitutional right at issue "was clearly established at the time of the violation" and whether the officials actions were "objectively reasonable" in light of law which was clearly established at the time of the disputed action. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Neither of those qualified immunity elements are at issue or play any role in determining Title VII claims against UT. Any attempt to broaden this Court's interlocutory jurisdiction to allow non-party Title VII interlocutory appeals on motions to dismiss or motions for summary judgment would be a dramatic change in this Court's precedent and would welcome a wave of new and premature and jurisdictionally invalid interlocutory appeals. UT's attempt to appeal the district court's Title VII rulings should be denied for lack of jurisdiction, as well as to conserve and protect this Court's judicial resources and efficiency.

## II. Defendant Hartzell Did Not Move To Dismiss Plaintiffs' Equal Protection Claims And They Are Not Before This Court.

Defendant Hartzell's appeal on qualified immunity focuses exclusively on Plaintiffs' §1981 claims. Plaintiffs First Amended Complaint also includes distinct claims against Hartzell for violations of

the Equal Protection Clause of the Fourteenth Amendment.[10] ROA 448¶2, 486-488¶¶226-243. Hartzell did not move to dismiss or raise qualified immunity regarding those Equal Protection claims, neither in the district court (ROA.539-586) nor in this appeal. Thus, Hartzell has waived this issue, Plaintiffs' Equal Protection claims remain pending, and are not part of Hartzell's interlocutory appeal.[11]

### III. Hartzell Has Waived Arguments That Plaintiffs Did Not Show "Deliberate Indifference" Or "Ratification."

For the first time on appeal, Hartzell argues that Plaintiffs must establish "deliberate indifference" or "ratification" in order to proceed with their §1981/§1983 claims and prevail on qualified immunity.[12]

---

[10] The United States Constitution provides an independent right for public sector employees to be free from race discrimination by a public employer. *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 549-50 (5th Cir. 1997). "Claims under §1983 for violation of equal protection may be brought against individual officials." *Yul Chu v. Miss. State Univ.*, 592 F. App'x 260, 266-67 (5th Cir. 2014). Claims brought under the Equal Protection Clause are distinct from claims under 42 U.S.C. §1981. *Felton v. Polles*, 315 F.3d 470, 479, 482-83 (5th Cir. 2002), *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533-35 (5th Cir. 1997). Additionally, claims under the Equal Protection clause do not require any pleading that the individual defendant is "essentially the same" as the governmental employer. *See e.g. id.*

[11] *Webster v. Kijakazi*, 19 F.4th at 720, ("Arguments not raised before the district court are waived and cannot be raised for the first time on appeal; *Holden v. Knight*, 155 F. App'x 735, 737 (5th Cir. 2005) ("Roth and Angelo do not advance an argument about the applicability of qualified immunity to Holden's race discrimination claim under §1981; therefore, they have waived any such argument." (stating that a party waives an issue by failing to adequately brief it on appeal)).

[12] Appellants Brief at 17-18,21-25,31

Hartzell did not in any way assert this argument at the district court in its motion to dismiss/motion for qualified immunity. Therefore, these arguments are waived. Garcia v. Orta, 47 F.4th 343, 349 (5th Cir. 2022); *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) ("Arguments not raised before the district court are waived and cannot be raised for the first time on appeal.")

**IV. Qualified Immunity Standards.**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Club Retro,* 568 F.3d at 194. "Once a defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to show that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time." *Bevill*, 26 F.4th at 275. If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were objectively reasonable considering law which was clearly established at the time of the disputed action. *Callahan*, 623 F.3d at 253.

## V. Plaintiffs Meet The Qualified Immunity Test: It Is Clearly Established Law That A Public Employee May Not Discriminate On The Basis Of Race And Race Discrimination Is Never "Reasonable."

As the Fifth Circuit found in an analogous case, *Hannah v. United States*, 523 F.3d 597, 600 (5th Cir. 2008), "Answering the first question in the qualified immunity analysis is easy in this case."[13] The same is true here. The right to be free from race discrimination and retaliation in employment has been clearly established for many, many years. *Southard,* 114 F.3d at 549-50; *Piatt v. City of Austin,* 378 F. App'x 466, 469 (5th Cir. 2010); *Faraca v. Clements,* 506 F.2d 956 (5th Cir. 1975), *cert. denied*, 422 U.S. 1006 (1975) (upholding jury verdict against public employee under §1981 for race discrimination).[14] As this Court observed almost 20 years ago, "It was clearly established that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination of the sort alleged." *Blackwell v. Laque*, 275 F. App'x 363, 367 (5th Cir.

---

[13] While *Hannah* was a sexual harassment case, the court found that the answer to the first prong of the qualified immunity question was "easy" because the right to be free from sexual harassment in employment was clearly established for years. Similarly in the case at bar, the right to be free from race discrimination has been clearly established for years (even longer than sexual harassment).

[14] It is worth noting, the very statute at issue prohibiting discrimination on the basis of race in contracts, §1981, also known as the Civil Rights Act of 1866, was enacted more than 150 years ago.

2008) (qualified immunity denied on claim of race employment discrimination claims). Relatedly, *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 339 (5th Cir. 2003) found that at least since 1994 an employee's right to be free from retaliation for complaining about race discrimination in employment was an established protected right.

Regarding the second prong of the qualified immunity defense, whether the employee acted reasonably considering the clearly established law, "officials generally are precluded from proving that intentionally discriminatory conduct is objectively reasonable." *Piatt*, 378 F. App'x at 468-69 (citing *Southard,* 114 F.3d at 550 (sex discrimination); *Blackwell,* 275 F. App'x at 367 (race discrimination). "Thus, generally, where the evidence is sufficient to support a claim of intentional gender or race discrimination, any immunity defense will be foreclosed." *Id.*

While Hartzell's interlocutory qualified immunity appeal focuses in large part on whether it was clearly established under that a governmental employee can be liable for race discrimination under §1981 and whether they are "essentially the same" as the governmental entity (discussed *infra.)*, these arguments must not be a diversion from the absolute certainty that it was clearly established law that a state

employee may not discriminate or retaliate against another on the basis of race or complaints of race discrimination. There is simply no doubt that Hartzell, as any government employee, was on notice that discrimination and retaliation against Hispanics and Hispanics complaining of discrimination was illegal and that he could be held accountable if he were found to have engaged in such conduct.

## VI. Plaintiffs Complaint Easily Meets The Pleading Standards For Race Discrimination.

### A. *The Supreme Court And Fifth Circuit Have Emphasized That A Court Errs By Requiring Detailed Pleadings Of A Prima Facie Case.*

Because race discrimination is never "objectively reasonable," this brings the Court back to the question of whether Plaintiffs' allegations sufficiently allege that Hartzell engaged in race discrimination and retaliation.[15] As part of the review of Plaintiffs' complaint to determine if it sufficiently pleads a race discrimination claim against Hartzell, it is crucial to apply the standard of review both the Supreme Court and Fifth

---

[15] *C.f. Hannah,* 523 F.3d at 600 ("no one thinks that sexual harassment is objectively reasonable, the question is whether a reasonable person would have thought Arthur's specific acts constituted sexual harassment; that brings us back to the original question whether his behavior amounted to sexual harassment under title VII or §1983.

Circuit have specifically and emphatically held apply to discrimination pleadings on a motion to dismiss. In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), a unanimous Supreme Court held that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case" under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973). The court explained that "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Id.* (citations and quotation marks omitted).[16]

In *Swierkiewicz*, the Supreme Court explained that Federal Rule of Civil Procedure 8(a)(2) "provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" 534 U.S. at 512 (citing *Conley* v. *Gibson,* 355 U.S. 41, 47-48 (1957)). The court further explained, "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not

[16] Additionally, the Supreme Court has held that the burden of establishing a prima facie case of disparate treatment was never meant to be and "is not onerous." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

the test." *Id.* at 515 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Following this directive from the Supreme Court, the Fifth Circuit has also clearly held "a plaintiff need not make out a prima facie case of discrimination [under *McDonnell Douglas*] in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) Rather, a plaintiff need only plead sufficient facts on the *ultimate elements* of a claim to make their case plausible. *Id.* The court held that there are only two ultimate elements of a disparate treatment claim under Title VII: "(1) an adverse employment action, (2) taken against a plaintiff because of [his] protected status." *Id.* (quotation marks and citations omitted). While it may be "helpful to reference" the prima facie elements, the Fifth Circuit *made clear*, "[w]e reiterate, however, that a court errs by requiring a plaintiff to plead something more than the ultimate elements of a claim. A court thus inappropriately heightens the pleading standard by subjecting a plaintiff's allegations to a rigorous factual or evidentiary analysis under the *McDonnell Douglas* framework in response to a motion to dismiss." *Id.* (citing *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016) and *Swierkiewicz*, 534 U.S. at 512).

Finally, illegal discrimination (and/or retaliation) *does not have to be the only reason* for a termination. Discrimination or retaliation need only be just *one* of the "but for" causes (or "motivating factors") of an employment action. *Leal v. McHugh*, 731 F.3d 405, 415 (5th Cir. 2013). As the Supreme Court has explained, the "but for" causation legal standard used in employment cases "can be a sweeping standard" and that employment decisions frequently "have multiple but-for causes." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020). Thus, Plaintiffs pleadings do not need to rise to such a level or negate the possibility that other factors may have also been involved.

### B. *Plaintiffs' Plead Ample Facts That Hartzell Was Personally Involved In The Discriminatory Actions At Issue.*

Defendant Hartzell incorrectly claims that Plaintiffs do not allege that Hartzell was personally involved or personally participated in the discrimination at issue.[17] Hartzell further acknowledges that a defendant can be liable under §1983 if he overtly and personally participates in the violation of the plaintiff's rights.[18] Such is the case here.

[17] Appellants' Brief at 21-22.
[18] *Id.*

Top administration at UT, including Hartzell were aware of and personally acknowledged the disparities in UT's treatment of Hispanic faculty in pay, promotions to compensated positions of authority and endowments. ROA.459-462¶¶63-86. This included UT's own statistical data that showed Hispanic full Professors across the university had consistently been paid significantly less than White full Professors for nine consecutive years (2009-2018) with an annual average of 12% lower per year. ROA.460-61¶79. The HER also conducted a statistical analysis (controlled for departments) that corroborated UT's findings, specifically that the 47 Hispanic full Professors at UT were paid 13% less than the 758 White full Professors. ROA.459¶68, ROA.502. In actual dollars, Hispanic full Professors were paid an average of $25,342 less per year than their White counterparts. Additionally, the analysis found that the compensation of Hispanic professors did not correlate to their publication records (a significant factor in academia), while the compensation of non-Hispanic professors did correlate with their publication records. ROA.502.

The striking university wide disparities in pay between Hispanic and White professors support the "ultimate element" that Plaintiffs were

discriminated against because they are Hispanic. The Supreme Court held in the seminal case *McDonnell Douglas* that statistical evidence may be helpful and used to show discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973). *See also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) ("[s]tatistical analyses have served and will continue to serve an important role" when discrimination is a disputed issue). In *Uffelman v. Lone Star Steel Co.,* 863 F.2d 404, 406-408 (5th 1989), this Court affirmed a jury verdict for age discrimination, finding that the jury was entitled to infer discrimination from evidence that the defendant's a reduction in force had disproportionate impact on older workers. Similarly, in *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576-77 (5th Cir. 2003) this Court held that evidence supporting a discrimination verdict included "the fact that 14 employees over fifty years of age, at least 11 of whom did not request severance packages, were targeted" for termination as well as evidence that employees assigned to a particular account—95 percent of whom were men over 40—were terminated and replaced by different employees, 95 percent of whom were women under 40. In *Miller v. Raytheon Co.*, 716 F.3d 138, 145 (5th Cir. 2013), this Court also affirmed a jury's willful age-

discrimination verdict based, in part, on the undisputed fact that "77% of the employees laid off in supply chain management were at least 48 years old."

While the admissibility and weight of such evidence is for another day, at the motion to dismiss pleadings stage the compelling facts showing different (and worse) treatment of Hispanic faculty support Plaintiffs' discrimination claims.

Importantly, the HER, submitted on October 8, 2019, nine months prior to Hartzell's installation as President,[19] led to admissions and acknowledgements from UT's President Fenves and other high-ranking officials that the disparities did exist for Hispanic faculty. ROA.461¶82 In response to the President's acknowledgement of the disparity in Hispanic professors' salaries, in the Spring of 2020, UT Provost McInnis allocated $3 million for "Equity Raises." ROA.462¶84.

### C. *Hartzell Intentionally Refuses To Consider, Investigate Or Act On Concerns Of Discrimination Raised By Hispanic Faculty.*

Hartzell, who became Interim President of UT just a few months later in the Summer of 2020, was certainly aware of the well-documented

[19] ROA.459¶67

complaints of discrimination raised by Hispanic faculty acknowledged by his immediate predecessor only a few months before. Hartzell was also aware of the Equity Raises that had been promised to address these issues. However, after Hartzell became Interim President in or around July, 2020, Hartzell's Senior Vice Provost disclosed that only approximately 10 percent, or $306,000 of $3 million fund[20] was being allocated for pay raises for the approximately 132[21] Hispanic professors at UT. That is an average of just $2,318 per Hispanic faculty member, far less than the documented pay differences. Hartzell also personally received a report from a faculty committee (for which Martinez was a principal author) on July 27, 2020, citing dramatic cuts in funding for programs that focused on Hispanic topics. ROA.462-63¶¶89-91. Hartzell chose to not restore the funding. ROA.463¶93.

Importantly, Hartzell personally received a written communication on pay discrimination towards Hispanic faculty and a written request for equity raises on or about August 3, 2020. ROA.463¶93-94. Hartzell did not respond to the pay discrimination report or request for raises for

[20] ROA.462¶¶84,87.
[21] 47 full Professors, ROA.459¶68; 38 Assistant Professors, ROA.929; 33 Associate Professors, ROA.930.

Hispanic faculty. ROA.463¶93-94. However, under Hartzell a committee was created (the Equity Review Process Consultative Committee "ERPCC") in November 2020. ROA.463-64¶96. The ERPCC's purpose was to assess salaries among professors and to work with an outside contractor, hired by Hartzell, that would analyze and make recommendations on salary inequities generally, but no mention was made of the pay disparities among Hispanic faculty. ROA.463-64¶96.

As a result of Hartzell's reversals of UT's prior decisions to acknowledge and rectify the disparities experienced by the Hispanic faculty, nine Hispanic professors, including Plaintiffs, filed charges of discrimination in late fall 2020 and early 2021. ROA.464¶99. Then, less than four months later, with no explanation, data, or justification, after the discrimination and retaliation complaints were filed with the DOL, Hartzell abruptly disbanded the committee tasked with looking at salary disparities, terminated the outside contractor hired to analyze the disparities, and then refused to take any action towards fixing the disparities. ROA.464¶¶100-101. With full knowledge and credible evidence of discrimination in pay between Hispanics and White professors, Hartzell refused to correct, investigate, respond to complaints

of discrimination, or even address the concerns and chose to continue the alleged discrimination against Hispanics.

### D. *Plaintiffs More Than Sufficiently Plead Hartzell's Personal Involvement With Discrimination and Retaliation Towards Plaintiffs.*

Against this backdrop and knowledge of discriminatory pay and treatment towards Hispanics, Hartzell also personally was involved in the salary and other employment actions directly impacting Plaintiffs.

UT's own rule, HOP-2.2160, unequivocally provides that Hartzell as president is personally responsible and makes all decisions for salary rates and promotions. ROA.454¶42. The relevant portions of rule (which is in evidence in this matter) provides:

> Responsibility for preparing *recommendations* for hiring of faculty ..., salary rates, promotion, ... rests with the Budget Council (or other departmental governing body) and the department chair. Administrative officers at each level shall give full consideration to recommendations from the level below. In the case where a recommendation is modified or disapproved the action should normally be taken only after consultation with the level below. *All recommendations* [for hiring of faculty ..., salary rates, promotion] *shall be forwarded to the president for final evaluation and decision. No commitment regarding salary rates, promotion, tenure, or renewal of appointment may be made without the approval of the president.*

RAO.1166 (emphasis added).

UT's rule is clear that Hartzell as president makes ***the decision*** on faculty salaries and promotion. *Id.* The rules further explicitly direct that *"No commitment regarding salary rates [and] promotion . . . may be made without the approval of the president." Id.* (emphasis added). The rules make clear and are essentially indisputable that any decisions regarding salary, promotion or endowments *are Hartzell's decisions.*

HOP-2.2160 further illuminates Hartzell's involvement in salary and promotion decisions and makes clear his ultimate decision-making authority:

> *The president may accept, reject, or modify all recommendations forwarded and may make decisions with regard to salary increases, promotion in rank, the award of tenure, renewal of appointment, or non-renewal of appointment of a faculty member regardless of whether a recommendation has been received.*

ROA.1167 (emphasis added).

HOP-2.2160 requires even further personal involvement by Hartzell and requires him to issue, review and approve guidelines used in salary and promotion:

> *The president will issue annually the institutional guidelines on budget preparation…*
>
> The dean of a college or school, in consultation with the executive vice president and provost, may promulgate and,

> *after review and approval by the president*, distribute to the faculty such additional procedural guidelines and information as may be appropriate to the evaluation of faculty for salary advancement, promotion, or the award of tenure in the college or school. . . .
>
> Reconsideration of a *salary rate*, a *promotion* or tenure *decision*, or a renewal or non-renewal decision *made by the president* may be requested if it is based on new evidence or on evidence of an infringement of the laws or constitution of this state or the United states.

ROA.1166-67 (emphasis added).

Regarding endowments, Regents Rule 60202 also provides that UT's "*president is responsible for maintaining oversight of Endowments* established to support faculty positions, including assignment of holders and use of distributions, but may delegate this authority." ROA.455¶47. HOP 2-2440 provides that UT's president has delegated oversight authority for endowments to the "Executive Vice President and Provost," the second highest ranking position at UT immediately below President. *Id.*¶48. Endowments are extremely important in academia and it is a reasonable inference that Hartzell was personally involved in the alleged discriminatory endowment decisions.

Defendant Hartzell argues that Plaintiffs did not specifically plead whether their supervisors sent salary and promotion recommendations

to Hartzell and whether he made decisions on their specific pay and promotion decisions.[22] Because UT's rules require "recommendations" to be forwarded to Hartzell and that he conducts an evaluation and makes the decision, it is absolutely a "reasonable inference" that this was done in Plaintiffs' case. To infer otherwise goes against motion to dismiss law standards. Moreover, Defendant Hartzell knows it is simply common sense that Plaintiffs were not present and did not have behind the scenes access to the UT President's actions. Importantly however, the Fifth Circuit does "not require a plaintiff to plead facts peculiarly within the knowledge of defendants" *Morgan v. Hubert*, 335 F. App'x 466, 472 (5th Cir. 2009). The facts omitted clearly fall into this category, but the known facts pled and reasonable inferences from them clearly suffice at the motion to dismiss stage to show Hartzell's personal involvement. Discovery and motions for summary judgment will allow Hartzell and the Plaintiffs to further articulate Hartzell's personal knowledge and actions.

### E. *Plaintiffs Have Fully Established Disparate Treatment Regarding Pay And Defendants' Cited Cases Are Easily Distinguishable.*

Defendants rely on two cases to support their assertion that

[22] *See e.g.* Appellant's Brief at 25,47.

Plaintiff's complaint should be dismissed on the pleadings. Both cases are easily distinguishable. *Chhim*, 836 F.3d at 469 involved a pro se complaint in which the plaintiff alleged that he was not selected for a supervisor position because of his race, color, or national origin. The Fifth Circuit observed that "Chhim's claims can be somewhat difficult to discern." The Fifth Circuit further found that his Chhim "pleads *no facts* that suggest the applicant hired by the University was less qualified than Chhim or was similarly situated." *Id.* (emphasis added). Chhim "speculated" that the person selected was "less qualified," however, that person had 25 years experience and Chhim pled *no other facts* that showed Chhim was more qualified.

Defendants also rely on *Angus v. Mayorkas*, No. 22-50600, 2023 U.S. App. LEXIS 14506, at *15 (5th Cir. 2023). In *Angus,* the Fifth Circuit affirmed the dismissal of another pro se plaintiff's claim in which the plaintiff alleged that she was not selected for a position because of her sex. The court based the dismissal on the fact that the plaintiff *only alleged* that she was a member of a protected class, was qualified for the position sought, suffered an adverse employment action, but "*failed to allege* that comparators outside her protected class were treated more

favorably in the selection process" or "*any other facts* as to the candidates' experience, qualifications, or other relevant attributes." *Id.* (emphasis added).

Defendants argue Plaintiffs's Complaint does not state (1) what specific pay decisions they are challenging; (2) who specifically made these decisions; (3) what Plaintiffs were paid; (4) what Plaintiffs believe they should have been paid; (5) who their comparators are; (6) what the comparators experience and qualifications are; and (7) what the comparators were paid.[23] Defendants misstate the content of Plaintiffs' Complaint as well as the law in this area.

Plaintiffs make clear in their Complaint that they are referring to the annual compensation decisions made "within the actionable period of this lawsuit." ROA.446¶¶114,116, ROA.486¶229. For Plaintiffs' claims under §1981, the date of the filing of the lawsuit determines the "actionable period," which is four years. *Belton v. Geo Grp., Inc.*, No. 21-30144, 2021 U.S. App. LEXIS 36150, at *8 (5th Cir. 2021).

Similarly, Defendants fault Plaintiffs for not specifically identifying the amount they were actually paid, what amount they

[23] Appellants' Brief at 43-44.

should have been paid, or what their comparators were actually paid. Defendants cite no case law requiring pleading detailed damage information in a complaint or that supports the dismissal of a complaint when the plaintiff does not publicly plead their own salary or the salary of comparators. Additionally, as pled in Plaintiffs' Complaint, UT does not publicly disclose the complete amounts of financial resources paid to individual professors. ROA.454-55¶46. With respect to compensation from endowments, UT frequently appoints faculty to endowed Chairs and Professorships with little or no transparency about criteria, process, and with no written deliberations about why any candidate was selected or, for that matter, passed over. *Id.* at ¶51. Thus, it would be impossible for Zamora and Martinez to plead such detailed information, which further illustrates the importance and necessity of discovery in this case.

Regarding identifying decision makers, Plaintiffs plead that they were paid "significantly less than comparable, similarly situated non-Hispanic fellow History Department full Professors under *the same decision-makers*." ROA.446¶¶114, 116 (emphasis added). Under UT's policies, Hartzell is directed to and responsible for "evaluation" and making the "decision" concerning all salary and promotion decisions.

ROA.454-55¶¶42, 52, ROA.1166. Thus, he is the relevant decision-maker for purposes of this appeal. Additionally, none of the cases cited by Defendants even requires that plaintiffs identify specific decision makers.

Plaintiffs also plead that they were paid "significantly less than comparable, similarly situated non-Hispanic fellow History Department full Professors under the same decision-makers." ROA.466¶¶114,116 Plaintiffs further specifically plead that UT paid "a higher salary to at least three specific, identified peers," even though each "has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor."

Hartzell responds to these allegations that similarly situated non-Hispanic comparators were paid more by first arguing that the pay received by Plaintiffs was, not discriminatory because of the salary determination process used by the History Department was objective.[24] Defendants' argument is essentially that UT used a legitimate non-discriminatory basis for setting Plaintiffs' compensation, however, such an argument and rebuttal is not pertinent until the summary judgment

[24] Appellants' Brief at 6-7,11,41,46.

stage, and even then, only *after* a plaintiff establishes his prima facie case. *Swierkiewicz,* 534 U.S. at 511-12. Additionally, the information cited by Hartzell absolutely does *not* prove that there was no discrimination regarding Plaintiffs' salaries. For example, Hartzell cites language from the HER stating that "*To some extent* salaries are within each person's control . . ."[25] This obviously does not mean that there could be no discrimination and ignores countless other places within the HER and Plaintiffs' complaint that specifically allege discrimination in their own and Hispanic faculty compensation. The references to the "objective" History Department standards also reveal that while there was a formula used, it also included discretionary and subject categories such as "equity raises."[26] Moreover, Plaintiffs allege in their complaint that their pay was less than others who had fewer accomplishments, publications etc. Because this is a motion to dismiss on the pleadings, Plaintiffs do not have the opportunity to testify or rebut Defendants' specious claims, but at the appropriate stage Plaintiffs will testify and provide evidence that although the policy purported to be neutral, in fact

[25] *Id.* at 46 (emphasis added).
[26] *Id.* at 7.

it was not applied neutrally.

Defendants' argument that the number of courses taught is not a relevant factor in determining salary at UT (Dkt.17,p.28) is also a rebuttal argument and would be a highly disputed fact issue at summary judgment. Moreover, the documents used to justify defendants' claim simply do not conclusively establish that the number of courses taught is not used when considering salary and promotion decisions. Again, Defendants raise unsupported fact issues appropriate for summary judgment, not a motion to dismiss. Similarly, Defendants' argue that length of service is not a factor for determining salaries and suggest that non-discriminatory "pay compression" is responsible for Plaintiffs' salary disparities with their similarly situated white colleagues. Again, these arguments about comparators and alleged "non-discriminatory reasons" for the pay disparities do not negate the affirmative clear allegations of discriminatory pay, as Defendant would like the Court to believe. Rather they raise highly disputed issues of fact that can only be resolved at summary judgment or by the jury, not on a motion to dismiss on the pleadings.

Defendants' argument that Plaintiffs did not plead the specific

names of the similarly situated comparators who are paid more are also without merit. There is no case law that requires such pleading. Moreover, Plaintiffs are still tenured professors working at UT and wish to maintain professional relationships with their colleagues. Out of respect, they wish to avoid placing their colleagues' names in publicly available court filings and debating their relative qualifications until necessary, which is not at this early pleading stage.[27]

### F. *Plaintiffs Have Pled Facts Establishing UT's Disparate Treatment of Hispanics In Promotions.*

Plaintiffs have pled more than sufficient facts to establish failure to promote claims. Similar to its arguments regarding discriminatory compensation, Defendant argues Zamora's endowment claim should be dismissed because he did not plead (1) what endowment he believes he should have received; (2) who the decision-makers were; (3) why he believes these decision-makers harbored animus towards Hispanics; (4) who received the other endowments in question; and (5) what the recipient's qualifications were.[28]

---

[27] Other evidence supporting discriminatory compensation includes the document and significant disparities in pay university wide between Hispanic and White professors, including UT's own data.
[28] Appellants' Brief at 47-48.

Initially, as with its compensation arguments, Defendant cites no authority that Plaintiffs are required to plead many of these facts at the motion to dismiss stage. Regarding qualifications and comparators, Dr. Zamora pleads that he was more qualified than at least three non-Hispanic peers who received endowments, including that he has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor. ROA.472¶¶153-154. Zamora also pleads that the endowment decisions were made "by the same decision makers" who made decisions relating to his non-Hispanic peers who received endowments sooner, and on information and belief, are paid more money than Zamora. *Id.*

Additionally, UT does not publicly disclose the full amounts of endowments paid to individual professors and frequently appoints faculty to endowed Chairs and Professorships with little or no transparency about criteria, process, or even when or how endowment awards are determined. ROA.454-55¶¶43-51. Thus it's impossible without discovery to plead most of the points Defendants claim as issues, and a plaintiff is not required to plead facts peculiarly within the knowledge of defendant. *Hubert,* 335 F. App'x at 472. Zamora's pleading

with respect to endowments provides sufficient allegations relating to decisionmakers, qualifications, discriminatory animus and Hartzell's personal involvement.

With respect to the Plaintiffs' claims relating to History Department Chair both Plaintiffs plead numerous factual allegations that fully support their individual claims for failure to promote regarding the chair positions. ROA.468-71¶¶124-149. These include UT's failure to follow its own policies. *Id.* at 130-133, 135. An employer's failure to follow its own policies raises fact issues of discrimination at summary judgment. *Burton v. Freescale Semiconductor, Inc.,* 798 F.3d 222, 236, 239 (5th Cir. 2015). Defendants claim that the failure to follow policies is not evidence of discrimination because UT never consistently followed its policies. As alleged, while the department had policies for selection of department chair, Plaintiffs allege they failed to follow and disregarded its policies *specifically to select a White or non-Hispanic to the position.* Additionally, this is a detailed summary judgment argument based on summary judgment cases and not appropriate at the pleadings stage.

Plaintiffs plead they were more qualified for the chair and

assistant chair positions, including that they had been employed longer at UT, had more years in rank as a full professor, taught more courses and had more publications and/or a better publication record than those selected. ROA. 469-70¶¶136,138,140. Again, Defendants' claim essentially that none of these qualifications are used in the selection process is a highly disputed fact argument for summary judgment.

As the Fifth Circuit has clearly held, scrutinizing "whether [the plaintiffs'] fellow employees were really 'similarly situated'" or "were treated differently under *nearly identical* circumstances" is more appropriate at the summary judgment stage and not on a motion to dismiss. *Cicalese*, 924 F.3d at 767.

Defendant(s) claim that Zamora did not apply for the positions has no merit when the white applicants who were selected also did not apply. Finally, Plaintiffs' allege compelling factual evidence regarding document lack of Hispanics in leadership at UT which supports their claims regarding failure to promote. *McDonnell Douglas Corp.* 411 U.S. at 805, *Int'l Bhd. of Teamsters*, 431 U.S. at 339, *Miller*, 716 F.3d at 145, *Palasota*, 342 F.3d at 577.

### G. *The Law Was Clearly Established That A Public Employee Can Be Held Liable For Race*

***Discrimination and Retaliation Under §1981 If They Are Personally Involved.***

Defendant Hartzell attempts to muddy the waters of long-standing case law, arguing that §1981 liability for race discrimination by individual government defendants was not "clearly established." As noted above, it is clearly established law that a public employee may not discriminate based on race. Additionally, the Fifth Circuit case law that public employees can be individually liable under §1981 for race discrimination has been clearly established for at least 50 years.

Twenty-five years later *Faraca* remains binding, clearly established precedent that an individual governmental employee who discriminates on the basis of race can be held liable. Indeed, in *Foley*, 355 F.3d at 337, the Fifth Circuit rejected the defense of qualified immunity holding it was "clearly established" law that individual state employees could be liable under §1981 for race retaliation. *Foley* relied on *Faraca* and held "we have … accepted that §1981 liability will lie against an individual defendant if that individual is 'essentially the same' as the State for the purposes of the complained-of conduct."[29] To

[29] The court's language regarding "essentially the same" came from *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997), a case brought by an individual against a

determine if the individual defendant is "essentially the same," the court considered whether the defendants "*exercised control over the faculty positions and titles* held by [the plaintiffs]. If so, the [defendants] were 'essentially the same' as [the University of Houston] for purposes of the retaliatory conduct alleged in this case." *Id.* (emphasis added). as UHV for purposes of the retaliatory conduct alleged in this case. The Fifth Circuit ruled that the plaintiffs could proceed against the state employees individually, holding that the district court correctly found genuine issues of material fact "as to whether the Appellants exercised control over the faculty positions and titles held by Dr. Foley and Dr. Hutto."

Similarly here, Plaintiffs have pled more than sufficient facts that Hartzell "exercised control over the faculty positions and titles" they held. These facts include UT's policies that indisputably state that Hartzell is responsible for the "evaluation" of and "decisions" on all faculty salary and promotion decisions, as well as other facts discussed

non-governmental corporate defendant. In *Bellows*, the court characterized the holding in *Faraca* as finding that the individual state employee could be held liable under 1981 because he was acting on behalf of the state, his actions were indistinguishable from that of the state and "the director and the state were essentially one and the same."

above. Additionally, Hartzel was personally presented with reports of discrimination, disbanded the ERPCC, terminated the contractor, and knowingly took no steps to address Hispanic discrimination after Plaintiffs and others filed charges of discrimination. Thus, Hartzell "exercised control over the faculty positions and titles" at issue in the salary and promotion decisions of Martinez and Hartzell. Accordingly, as in Foley, Hartzell is "essentially the same" as for purposes of §1981 liability. Under the clearly established law, Plaintiffs have pled sufficient facts that Hartzell is "essentially the same" as the state.

Additionally, *Foley* was a case decided at summary judgment. Because this case is only at the pleadings stage on a motion to dismiss, the standard for what is sufficient to show liability is less demanding. *Swierkiewicz*, 534 U.S. at 512, *Cicalese*, 924 F.3d at 766. Hartzell and Plaintiffs will of course have the opportunity to present actual evidence at summary judgment to allow this Court to determine whether there are fact issues and whether he in fact "exercised control over [Plaintiffs'] faculty and title positions."

Hartzell's attempts to cast doubt on *Faraca* and *Foley* are without merit and simply amount to obfuscation. For example, Hartzell claims

that *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701 (1989) "cast serious doubts on *Faraca's* analysis." This is simply not true for the holding in *Faraca* or the relevant issues in this appeal. *Jett* held and confirmed that municipal entities cannot be held liable under §1981 and §1983 under a theory of respondeat superior, consistent with *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *Jett*, 491 U.S. at 735. *Jett* held that the exclusive remedy for enforcement of rights secured by §1981 is a cause of action brought pursuant to §1983. *Id.* at 733. Notably, unlike in the present case, liability of the individual defendant in *Jett* under §1981 was not even considered as the individual defendant had previously settled and was no longer a party to the action. *Id.* at 708.

Hartzell claims that *Oden v. Oktibbeha Cty.*, 246 F.3d 458 (5th Cir. 2001) and *Felton*, 315 F.3d 470 prevent qualified immunity because the law is not clearly established as to individual liability of a state employee under §1981. Importantly however, both were decided *before* *Foley* held that it is well settled for qualified immunity purposes that an individual state employee can be liable under §1981 if he exercises control over the position and decisions at issue. Moreover, neither case truly impacts or is relevant to qualified immunity in this matter.

Besides the fact that *Oden* was decided before *Foley* made clear it was clearly established law that an individual government employee can be held liable under §1981, *Oden* is distinguishable from the present case in that it held that it simply appears to hold that an individual elected sheriff defendant was acting in his official capacity and thus could not be held liable under §1981. 246 F.3d at 464. This is not the case here as Plaintiffs are only pursuing their claims against Hartzell in his individual capacity. Additionally, *Oden* did not cite, consider, or distinguish *Faraca* in any way. *Oden* has also been criticized, questioned, and distinguished and questioned by numerous courts.[30]

At least one court specifically denied an individual defendant's claim of qualified immunity employee, finding that despite *Oden* it was clearly established law in the Fifth Circuit that a plaintiff can bring a §1981 race discrimination claim against an individual governmental employee defendant in his individual capacity. *Harris v. City of Balch Springs*, 9 F. Supp. 3d 690, 692-93 (N.D. Tex. 2014). *Harris* explained *Oden's* holding and distinguished it because the plaintiff's claims that

[30] SSS *E.g. Seibert v. Jackson Cty.*, No. 1:14-CV-188-KS-MTP, 2015 U.S. Dist. LEXIS 102632, at *19-20 (S.D. Miss. 2015); *Porter v. Lowndes County, Mississippi,* 406 F. Supp. 2d 708 (N.D. Miss. 2005), *Rogers v. Humphrey Cty.*, No. 4:09-CV-037, 2009 U.S. Dist. LEXIS 103863, at *1 (N.D. Miss. 2009) and others.

were dismissed in *Oden* were not brought under §1983, as *Jett* required (and which Plaintiffs have done in the present case). *Id.* Additionally, *Harris* distinguished *Oden* because it involved an elected official defendant as opposed to a governmental employee. *Id.*

*Felton* has even less relevance than *Oden* and in fact supports Plaintiffs' §1981 claims against Hartzell. In *Felton*, (also decided before Foley) the Fifth Circuit denied qualified immunity as part of a motion for summary judgment, finding that the plaintiff had not provided sufficient evidence to create a genuine issue of fact supporting his discrimination claims. 315 F.3d at 480-81, The court specifically did *not* decide the issue of whether and under what circumstances a §1981 claim could be brought against an individual defendant. While discussing the issue, *Felton* actually concluded from *Faraca* and *Bellows* that "it would appear that [a state employee] could *only* be amenable to §1981 liability *if* he were 'essentially the same' as the State for purposes of the complained-of conduct." *Id.* (emphasis original.) Thus, while *Felton* did not decide the issue later confirmed in *Foley*, it generally acknowledged the principle that §1981 race discrimination claims can be brought against individual government defendants through §1983. Hartzell's

claim that the law was not clearly established on this point has no merit.

### H. *The Hispanic Equity Report Does Not Preclude Plaintiff's Claims of Intentional Discrimination Against Hartzell.*

Defendant Hartzell repeatedly argues that Plaintiffs' complaints of discrimination against Hartzell fail because, allegedly, Plaintiffs' "Hispanic Equity Report" (ROA.908-1095 (a document referenced in Plaintiffs' complaint) *only* concerns "unintentional discrimination" or "unintentional bias" against Hispanics.[31] While the HER attributes much discrimination against Hispanics to "unconscious" bias and those who deny they have biases, the HER simply does **not** state (and Plaintiffs do not allege) that all discrimination against Hispanics at UT is due **only** to unconscious bias or unintentional discrimination. No matter how many times Defendant repeats this argument, it is simply false.

Defendant Hartzell emphasizes the HER's use of the term "Hispanopia" (a combination of "Hispanic" and "myopia") which was coined in the report **"to name discrimination against Hispanics."** ROA.978. Contrary to Defendant's false claim, the HER and more relevantly Plaintiffs' First Amended Complaint, absolutely does not state

[31] Appellant's Brief at 3,12,16,18,38-40.

that "Hispanopia" refers only to "*unintentional* bias against Hispanics"[32] or that "unintentional discrimination" towards Hispanics is all that occurred. Such a claim is absurd and contrary to Plaintiffs' (and countless other Hispanics') lived life experiences.

After the HER lays out the significant discriminatory differences in pay, endowments and promotions between Hispanic faculty and White faculty, Plaintiffs, and the other authors of the report (who are all academics and include multiple other faculty beyond the Plaintiffs in this case) discuss what they postulate could be some of the causes of the discrimination. The HER specifically states, "We identified institutional patterns that might be described, in some cases, as inadvertent lack of inclusion, **but at worst, as ongoing discrimination against Hispanics**." ROA 977 (emphasis added).[33] Moreover, the HER specifically states:

> Many people think that racism consists mainly of intentional acts of discrimination committed by hateful, uneducated persons who consciously believe that another race is inferior to their own race. **To be sure, such racists exist.**

---

[32] Appellant's Brief at 39.

[33] *See also* ROA.912 (HER) "We have carefully analyzed the inequities noted and we believe that some of them constitute bias and discrimination against Hispanic employees."

ROA 978 (emphasis added).[34]

As much as Defendant claims otherwise, Plaintiffs have **not** "pleaded themselves out of court"[35] and did not state in the HER or elsewhere that all discrimination at UT is unintentional. To the contrary, Plaintiffs make clear repeatedly in their complaint that they are challenging "intentional" acts of discrimination and disparate treatment, as well as the disparate impact of discrimination (not at issue in this appeal).

Moreover, the fact that the HER recognizes that not all discrimination towards Hispanics is committed with a malevolent intent and may involve some form of "unconscious" bias, is a red herring, not a legal issue raised by Plaintiffs' First Amended Complaint, and certainly not at this stage. Virulent and blatant animosity is not a legal threshold that any plaintiff need meet in a discrimination complaint, let alone at the motion to dismiss pleading stage. As the Supreme Court recently

---

[34] It is also important to recognize the context in which the HER was written and presented. As academics seeking positive change, it perfectly reasonable that professionals raising concerns of discrimination among their professional colleagues would do so in a diplomatic way so as to not offend others and get the most positive response possible to the concerns being raised. As the HER authors (again who include multiple others besides Plaintiffs) state "We have prepared this Report with good will and we want to help remedy the problems we describe."

[35] Appellants Brief at 50.

recognized in its unanimous decision in *Murray v. UBS Sec., LLC,* 144 S. Ct. 445, 453 (2024), "the 'normal definition' of 'discrimination' is 'differential treatment.' In *Bostock*, the Court likewise observed that 'discriminate' typically means simply '[t]o make a difference in treatment or favor (of one as compared with others).' Prohibited discrimination occurs when an employer 'intentionally treats a person worse because of' a protected characteristic. In elaborating on the meaning of 'discriminate,' *Bostock* made clear that a lack of 'animosity' is 'irrelevant' to a claim of discrimination under Title VII. An animus-like 'retaliatory intent' requirement is simply absent from the definition of the word 'discriminate.' When an employer treats someone worse—whether by firing them, demoting them, or imposing some other unfavorable change in the terms and conditions of employment—'because of' the employee's protected whistleblowing activity [or in this case, protected status of national origin/race], the employer violates §1514A [or in this case, Title VII]." (*citing Babb v. Wilkie*, 589 U. S. 399, 405 (2020), *Bostock*, 590 US at 663,677-68, and *Automotive Workers v. Johnson Controls, Inc.*, 499 U. S. 187, 199 (1991) (explaining that a prohibition on discrimination "does not depend on why the employer discriminates" or the presence of

"malevolent motive").)

### I. *The District Court Properly Analyzed and Denied Hartzell's Motion to Dismiss Plaintiffs' §1983 Retaliation Claims Against Hartzell*

Plaintiffs assert that the District Court clearly and appropriately analyzed Plaintiffs' §1983 claim of retaliation against Hartzell, made a finding of Hartzell's retaliatory animus against Plaintiffs, commented on the adverse actions taken by Hartzell against the Plaintiffs, and then denied "Defendants' motion to dismiss with respect to … Plaintiffs' §1983 claims against President Hartzell in his individual capacity." ROA.1535-36 The District Court went on to state that "Plaintiffs' retaliation claims under Title VII and all claims against Defendant Hartzell in his official capacity are therefore **DISMISSED WITHOUT PREJUDICE**." ROA.1536 (emphasis original).

Plaintiffs made no claims under Title VII against Hartzell. See Count V and Count VII in the First Amended Complaint. Plaintiffs' claims for retaliation under Title VII were only against UT and claims for retaliation under §1983/§1981 and Equal Protection were made against Hartzell, respectively.

It is important to note here that Plaintiffs' retaliation claims

against UT and Hartzell are somewhat different in that UT would be liable for retaliation under Title VII for periods before Hartzell had become president had the District Court not dismissed the Title VII retaliation claims (without prejudice) due to causation.[36] In contrast, Hartzell became President in July 2020, received reports from Plaintiffs and others complaining of discrimination against Hispanic faculty and programs less than a month later, refused to provide Hispanic faculty their share of Equity Raises, refused to acknowledge the disparate experience of Hispanic faculty. Then Plaintiffs and seven other Hispanic faculty filed complaints of discrimination and retaliation with the DOL three months later, and then Hartzell disbanded and cancelled a contract and work on investigating salary equity issues approximately six months later, thus establishing temporal proximity and substantively targeted retaliatory actions against Hispanic faculty.

The District Court's Order at issue in this appeal contained no analysis of a Title VII retaliation claim against Hartzell. ROA.1509-1515 The District Court's analysis of Plaintiffs' allegations of retaliation

[36] Plaintiffs intend to file an amended complaint reasserting Title VII retaliation claims when the stay in district court (due to this appeal) is lifted.

against Hartzell were conducted within the Order's §1983 section (ROA.1515-1525) and found the following:

- "Plaintiffs have plausibly alleged enough facts to draw a reasonable inference that President Hartzell held discriminatory and retaliatory animus towards them." ROA.1519
- "Plaintiffs have alleged sufficient involvement by President Hartzell for §1983 purposes" ROA.1523
- "President Hartzell personally received reports from Martinez and Zamora and others regarding 'UT's discrimination against Hispanics' on more than one occasion." ROA.1523-24
- Hartzell … cancelled that contractors work and disbanded the committee tasked with identifying and resolving the disparities." *Id.*
- "Hartzell is not entitled to qualified immunity at this stage for Plaintiffs' Title VII discrimination claims. ROA.1524
- "Denies … Defendants' motion to dismiss Plaintiffs' §1983 claims against President Hartzell in his individual capacity" *Id.*

Plaintiffs agree that the District Court mistakenly suggested that Plaintiffs made Title VII claims against Hartzell for discrimination, which they did not. See Count III and IV, which are Title VII claims only against UT. ROA.482-85.

"Plaintiffs' §1983 claims," as referenced by the District Court in its denial of Hartzell's motion to dismiss, include §1981 claims for race discrimination and retaliation and Equal Protection for race discrimination. ROA.486-88

While clarification may be needed, Plaintiffs believe that the

District Court's order at issue in this appeal supports the denial of Hartzell's motion to dismiss their retaliation claims against Hartzell under §1983/§1981. However, if this Court finds the District Court's unclear or ambiguous, Plaintiffs request that this issue be remanded to the District Court for further review as this Court might so direct. *See e.g. Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 644 (5th Cir. 1992) ( "a district court [must] explain its reasons for granting a motion for summary judgment in sufficient detail for us to determine whether the court correctly applied the appropriate legal test.") Assuming arguendo that this Court finds that the District Court did dismiss Plaintiffs' §1981/§1983 retaliation claims, this Court should remand those claims without prejudice consistent with the District Courts ruling on the Title VII retaliation claims.

## CONCLUSION

This Court should affirm the district court's order denying Defendant Hartzell's motion to dismiss Plaintiffs' §1981/§1983 claims for race discrimination and retaliation. This court should dismiss for lack of jurisdiction UT's appeal of the district court's order denying its motion to dismiss Plaintiffs' Title VII disparate treatment claims.

Respectfully submitted,

*/s/ Robert S. Notzon*
Robert S. Notzon
The Law Office of Robert S. Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563
(512) 852-4788 facsimile

*/s/ Robert W. Schmidt*
Robert W. Schmidt
Robert W. Schmidt Law Firm, PLLC
State Bar No. 17775429
bob@robertwschmidt.com
1502 West Avenue
Austin, Texas 78701
Telephone: (512) 484-2276
Facsimile: (512) 537-0708

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1.

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because Microsoft Word reports that it contains 12,886 words, excluding the material not counted under the rule, and complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it was

prepared in Microsoft Word using a Century Schoolbook proportionally spaced typeface (14-point in the brief and 12-point in the footnotes).

*/s/ Robert W. Schmidt*
Robert S. Notzon

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendants through the Court's electronic filing system at the following address:

Todd Dickerson, Todd.Dickerson@oag.texas.gov
Mary Quimby, Mary.Quimby@oag.texas.gov

By: /s/ *Robert W. Schmidt*
Robert S. Notzon